Reilly *v.* Walker Brothers, Appellant.

Argued May 4, 1966. Before BELL, C.J., MUSMAN-NO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

reargument refused April 17, 1967.

2

*Morris Gerber*, with him *Wisler, Pearlstine, Talone & Gerber*, for defendants, appellants.

*Richard Kirschner*, with him *Richard H. Markowitz, Daniel B. Brandschain*, and *Wilderman, Markowitz & Kirschner*, and *Miller, Harwitz & Brandschain*, for intervenor, appellant.

*Sidney M. DeAngelis*, with him *Stanley L. Kubacki*, and *Bean, DeAngelis, Tredinnick & Giangiulio*, for plaintiffs, appellees.

*Cyril L. Weston*, for plaintiff, appellee.

OPINION BY MR. JUSTICE O'BRIEN, March 14, 1967:

Walker Brothers, a manufacturing company, executed a pension plan and trust indenture in December of 1950, setting forth various provisions for the retirement of its employees. On January 3, 1951, Walker Brothers and Local Union B-1088, of the International Brotherhood of Electrical Workers, entered into a pension agreement, implementing the pension plan and trust indenture. This agreement set forth eligibility, the amount of pensions, the determination of continuous service, pension trust, administration, appeals procedure, a pension committee (half of whom would be designated by the Company, the other half designated by the Union) and other general provisions as to the term of the plan ("The terms and conditions of this agreement shall continue in effect until midnight, December 31, 1955 and from year to year thereafter unless amended as follows: . . .") and that if, for any

reason, the pension plan were dissolved, the way in which the funds would be distributed.

Walker Brothers was desirous of securing some stability in its labor relations and to hold its experienced employees. The pension plan enabled Walker Brothers to hold out the prospect of pensions and, in addition, to achieve substantial savings in taxes under the provisions of the Internal Revenue Code. The pension plan was administered and controlled solely by the representatives of Walker Brothers. The employes made no contribution of their own into the plan, and the Union had no voice in the operation of the plan or its policies or management. Under the terms of the pension plan and the trust indenture under which it was established, Walker Brothers, itself, was divested completely of any interest whatsoever in the pension fund.

In April of 1956, Walker Brothers and the Union, through mutual agreements, amended the pension agreement, extending it through December 31, 1960, and thereafter on a year to year basis unless terminated by either party after having given 60 days prior notice, and, in addition, reduced the necessary time of continuous service from 15 to 10 years, before an individual could share in the fund if it were dissolved.

In the latter part of 1962, Walker Brothers, facing financial difficulties, began a program of curtailing some of its activities with a view toward eventual termination. As a result of this curtailment, on December 28, 1962, over 100 employees of Walker Brothers were laid off. A majority of the employees laid off worked at the Wire Mill, which was completely shut down in January of 1963. Those employees laid off in December consisted of 3 classes; those in the Reilly class, who had already completed more than 10 years of continuous service on the date of their lay-off; the Nolan class, whose continuous service was more than

9 years but less than 10 years at the date of lay-off, and the Wentz class, who had served less than 9 years at the date of lay-off. During the following 12 months, the company continued to lay off additional employees as part of its plan of terminating its operations.

In October of 1963, the pension agreement was further amended by representatives of the Union and Walker Brothers. This 1963 amendment, Part III, §4, reads as follows:

"If for any reason this pension agreement is dissolved, all pension benefits are to be distributed first to those pensioners currently receiving pensions in an amount which will provide continuing pensions as determined by accepted actuarial methods. All remaining funds shall be distributed to all employees who have at the time the pension agreement is dissolved ten (10) or more years of continuous service. This provision shall also include all employees who have been laid off from the employ of Walker Brothers in the twelve (12) month period immediately prior to the dissolution of the fund. Each person's share of the remaining pension fund, after distribution to the pensioners currently receiving pensions, shall be in proportion to his years of continuous service with the Company.

"Effective January 1, 1964, Part I, Section II, shall be amended as follows:

"The amount of any pension granted pursuant to paragraph 1 of section I to an employee who shall have had at least twenty-five (25) years of continuous service at the time of his retirement shall be at a rate of Five Hundred Forty Dollars ($540.00) per year and a pension granted to an employee who shall have had ten (10) or more years but less than twenty-five (25) years of continuous service at the time of his retirement shall be at a rate of that part of Five Hundred Forty Dollars ($540.00) which the number of

years of his continuous service bears to twenty-five (25). Employees with less than ten (10) years of service shall not be eligible to a pension. The increase in the pension benefit shall be applicable to all those persons currently receiving pension benefits in accordance with the provisions of the pension agreement.

"If an individual leaves the employ of Walker Brothers for any reason other than 'Discharge for Cause' and he has accumulated a total of twenty-five (25) years of continuous service prior to his separation; such individual upon attaining age sixty-five (65) shall be entitled to receive full pension benefits from Walker Brothers Pension Fund in accordance with the provisions of Part I, Section II of the Pension Agreement as amended, even though such individual is no longer an employee of Walker Brothers. If for any reason the Pension Fund is dissolved then these eligible individuals shall receive their share of the Fund in accordance with Part III, Section 4, of the Pension Agreement as amended."

Following this amendment, Walker Brothers negotiated the sale of all of its assets to International Fastener, and the board of directors then notified the trustees of the pension fund to terminate the fund. Following this directive, the trustees adopted a resolution on October 31, 1963, wherein it was decided that the fund would terminate on December 31, 1963. The trustees, in making the necessary preparations to terminate the pension plan, ascertained the names of all employees who, pursuant to the rules of eligibility and dissolution, were eligible to share in the fund and their respective benefits. Preparations were then undertaken to submit those documents necessary to the Treasury Department of the United States so that the approval of the Internal Revenue Service could be secured with regard to the proposed termination.

Prior to the liquidation and dissolution of the pension plan, the plaintiffs, along with those employees similarly situated, instituted a complaint in equity, setting forth therein that they were entitled to share in the fund about to be dissolved. Under the terms set forth in the pension plan, none of them were eligible, as they had all been laid-off for more than 1 year prior to the date of dissolution, or else had less than 10 years service at the time of dissolution. The pension plan specifically provided that a lay-off in excess of 12 months prior to dissolution, causing a break in continuous service, would render an employee ineligible for pension benefits regardless of prior service. The plan further held that an employee with less than 10 years service was not, under any circumstances, entitled to a share of any pension. Although, under the terms of the pension plan, the appellees were not entitled to any share or rights in regard to the pension plan, as their break in service was in excess of 12 months or because they did not have 10 years of service, the appellees sought an injunction against the proposed distribution of assets, and requested an order directing that they share in the pension benefits.

After this action was instituted, all parties agreed that distribution would be delayed pending the outcome of this litigation. Hearings were held in the court below and the chancellor, on August 27, 1965, in his adjudication, directed that the plaintiffs and those in their class be permitted to share in the dissolution of the pension funds. Both the Union and Walker Brothers filed exceptions to the chancellor's decree and order; those exceptions were dismissed on November 15, 1965, and, on December 27, 1966, the decree nisi of August 27, 1965, was made final. This appeal followed.

The chancellor found, in his findings of fact that the trustees were directed by the board of directors to

terminate the pension fund on December 31, 1963; that the labor agreement with the Union set forth the manner in which employees were to be laid off; that the term "continuous service" as used in the agreement, means service prior to retirement calculated from the employees' last hiring date; that continuous service would be broken if "a period of twelve (12) months elapses since the employee last worked for the Company, unless the employee has been continuously incapacitated"; that the pension plan contained the same provisions as the pension agreement; that in the event of dissolution, the trustees would be directed to distribute to the employees the amount remaining in the hands of the trustees on a proportionate basis after making necessary provisions for the continuation of pension payments to any former employees receiving pensions; that the distribution would be confined to those employees with 15 or more years of continuous service; that the board of directors had given authority to the trustees to alter, amend, revoke, or terminate, provided that no modification or amendment which affects the rights, duties or responsibilities of the trustees may be made without their consent; that under no circumstances would any part of the corpus of the trust be used for any purpose other than the exclusive benefit of the employees; that the pension agreement was amended on April 24, 1962, said amendment included the reduction of the continuous service necessary to share in the pension plan from 15 to 10 years or more of continuous service; and that as a direct result of this amendment, approximately 130 more employees were brought under the plan.

The chancellor further found that: "Between April 24, 1962, the date the IBEW and the company added 130 employees to share in distribution in the event of dissolution, which dissolution was ordered on October 31, 1963, the company laid off at least 154 employees,

8.

including the plaintiffs and intervening plaintiffs, with a combined continuous loyal service of approximately 1300 years, to whom the trustees deny a share in the distribution." and that ". . . on December 31, 1963, there were at least 154 additional employees who had rendered approximately 1300 years of service to the Company, and . . . who in equity are entitled to share in the distribution of the fund."

The chancellor, in deciding that the pension plan should not be enforced as written, reasoned that industry must, of necessity, have a dependable supply of labor; that one of the great problems of industry is to control a pool of adequate labor to meet the demands of a fluctuating market, and, therefore, industry is desirous of in some way maintaining some control over a labor force not needed during slack periods, sought to stabilize its labor force by offering certain fringe benefits to its employees as one of the means of securing this needed stability. The chancellor found that the board of directors of the company was in complete control of the pension plan, especially as to its date of termination, that the members of IBEW desired to have the plaintiffs included in the distribution, and on October 20, 1963, had passed a resolution to this effect. The chancellor went on to say that "The amendment of April 24, 1962, which reduced the 15-year continuous service requirement to 10 years, and the final amendment are an attempt by the Board of Directors of the Company to discriminate unreasonably in favor of some employees and against others by tinkering with the Pension Plan, when the Board of Directors knew or should have known that the Company was about to cease operations and the Pension Plan was about to be terminated. Being in complete control of the Pension Fund and having recently agreed to enlarge the class entitled to share in the distribution, the Board of Directors again unreasonably discriminat-

ed among its employees by passing its resolution terminating the Trust on December 31, 1963, especially since those who would gain by its unreasonable discrimination had resolved to fulfill the expectations of their fellow employees. The will of the employee members of IBEW and the unreasonable discrimination of the Board of Directors of the Company are sufficient grounds for this Court to refuse to enforce the Board of Directors plan for distribution of the fund.

"The record reveals equitable claims by every employee who was working on August 24, 1962, or thereafter, and who was not fired for cause or did not quit. Each employee's claim is proportionate to his years of continuous service."

The chancellor, in his conclusions of law, found that the employees' loyalty was the basis of his equitable claim on the pension fund; that "The Board of Directors of the Company discriminated unreasonably among its employees by the last two amendments to the Pension Fund."; that "The Court will not enforce the unreasonable action of the Board of Directors of the Company."; that "The Court will enforce the equitable claims of the employees."; and that "The equitable claim of each employee is proportionate to his continuous service.".

Appellants filed exceptions to the chancellor's adjudication, objecting to the conclusions of the chancellor that the amendments of April 24, 1962 and October 1, 1963, were attempts to discriminate unreasonably in favor of some employees; that these amendments constituted "tinkering" with the pension plan; that the board of directors, at the time of the amendment of April 24, 1962, should have known that the company was about to cease operations and terminate the pension plan, and that the board of directors unreasonably discriminated among its employees by terminating the trust as of December 31, 1963. Appellants further ob-

jected to the chancellor's findings of fact that the lay-off of plaintiffs on December 28, 1962, was an initial step in dissolving the business, but, rather, contend that this lay-off was in connection with the closing of the Wire Mill as it was being operated at a loss, and the failure of the union to accept job consolidation so as to reduce operating costs. Appellants went on to object to the failure of the chancellor to find that all of the plaintiffs and Donald Ayres, intervening plaintiff, have had their continuous service broken by a lapse of more than 12 months from the time of their lay-off on December 28, 1962, to the date of dissolution of the pension fund on December 31, 1963; and that no one of the plaintiffs or intervening plaintiff had any right or interest in the distribution of the funds, as not one of the plaintiffs or intervening plaintiff qualify to be included in the distribution under the terms of the original pension plan, pension agreement, or trust indenture, or any amendments to any of them.

The intervening defendant, to wit, the IBEW, Local No. B-1088, also excepted to the findings of the chancellor, specifically to the chancellor's finding of fact No. 29: ". . . because of the inference therefrom that the trustee, the Company or the Intervening Defendant deliberately or purposefully sought to deny a share in the distribution of the Pension Fund to laid-off employees when such employees did not qualify for such a share under the terms and provisions of the Pension Agreement and Pension Plan." The intervening defendant also excepted to the chancellor's finding of fact No. 57: ". . . because of its disregard for the clear and specific terms of the Pension Agreement and because it constitutes a rewriting of the Pension Agreement by the Chancellor." The intervening defendant further objected to the discussion of the chancellor that the accumulation of the pension fund was an incentive to each employee to continue to work for the company,

as such a statement indicates ". . . that the Pension Fund was anything more than a term or condition of employment just as wages, hours, vacations, holidays, welfare benefits, or any other term or condition of employment were an inducement to employees to continue working for the Company." The intervening defendant objected also to the chancellor's statement that the amendment to the pension plan of October 24, 1962, or any other amendment, was an attempt by the board of directors or anyone else to discriminate against any of the employees; and the chancellor's statement that the board of directors of the company or anyone else was engaged in "tinkering" with the pension plan. The intervening defendant also objected to the chancellor's complete disregard of the terms of the pension plan and pension agreement as amended, and his decision to distribute the funds in a manner contrary to the pension agreement.

As we said in *Shydlinski v. Vogt,* 406 Pa. 534, 537, 179 A. 2d 240 (1962) : " 'In passing upon the questions raised on this appeal we must adhere to the well-established rule that a chancellor's findings of fact, approved by a court en banc, have all the force and effect of a jury's verdict if they are supported by adequate evidence and ordinarily will not be disturbed on appeal: [citing cases]. However, the chancellor's "conclusions, whether of law or ultimate fact are no more than his reasoning from the underlying facts and are reviewable" . . . .' "

We agree with the chancellor that the pension plan was under the exclusive control of the company. However, we disagree with the chancellor's conclusion that the appellees are entitled to share in the pension plan. The agreement specifically sets out requirements for employees before they are entitled to share in the plan. The reduction in time from 15 to 10 years was not "tinkering", in our opinion, but, rather, we conclude,

was a bona fide attempt on the part of the board, the union, and the company to include more people in the plan.

We agree with appellants that the chancellor redesigned the pension plan to include appellees, basing his conclusion on his theory that the plan was an inducement given by Walker Brothers to enable it to stabilize its work force during periods of slack employment, and its attempt to achieve stable labor relations. We find, therefore, that the chancellor erred in disregarding the eligibility requirements set up under the provisions of the pension plan, by ignoring the provision that a lay-off period in excess of 12 months broke the continuous service required under the terms of the pension plan. See *Shore v. Bell Tel. Co. of Pa.*, 389 Pa. 445, 133 A. 2d 157 (1957). The chancellor does not have the authority to rewrite or amend a plan or make changes, in accordance with his own ideas, as to what is fair and equitable. Neither Walker Brothers, nor IBEW, had anything to gain from the manner in which the fund was distributed upon dissolution.

The agreement, in order to meet sound actuarial standards, and, of necessity, designed to meet the exacting standards established by the Internal Revenue Service, must necessarily take into consideration many factors such as normal or expected retirement age; the amount of retirement benefits; questions of termination of service with forfeiture or vesting of rights; the amount of employer's contributions; and the eventual determination of a formula made to provide for things such as normal retirement, deferred retirement, early retirement, and disability retirement, as well as the amount of credit to be allowed for both past and future service. See Bernstein, "The Future of Private Pensions" (1965).

There being no inequity or illegality in the terms of the pension agreement, it should be enforced in accord-

ance with its terms and courts have no authority to redraft the agreement to include people not entitled to benefit, to the detriment of those who are entitled to participate. See *Schneider v. McKesson & Robbins,* 254 F. 2d 827 (2d Cir. 1958).

Decree reversed, each party to bear own costs.

Mr. Justice ROBERTS concurs in the result.

Mr. Justice COHEN would affirm as to the Reilly Group.