437 F.2d 527
 T. C. BOASE, James C. Carlin, George L. Smith and Alex
Watson, on behalf of themselves and all others
similarly situated, Appellants,
v.
LEE RUBBER & TIRE CORPORATION v. Daniel N. HANDY, Robert M.
Brasaemle, Elden E. Leach, and Arthur H. Nellen,
Third-Party Defendants, Ernest M. Ikirt
et al., Intervening Plaintiffs.
Leo R. HOWLEY, Ralph W. Hawkins and Lawrence S. Anderson on
behalf of themselves and all others similarly
situated, Appellants
v.
LEE NATIONAL CORPORATION, formerly known as Lee Rubber &
Tire Corporation, Harry H. Beard et al.,
Intervening Plaintiffs.
 Nos. 18707, 18708.
 United States Court of Appeals, Third Circuit.
 Argued Sept. 29, 1970.
Decided Dec. 29, 1970, Rehearing Denied Feb. 11 and March 24, 1971.
 
 Martin A. Heckscher, Duane, Morris & Heckscher, Philadelphia, Pa. (John B. Martin, Henry T. Reath, Duane, Morris & Heckscher, Philadelphia, Pa., on the brief), for appellants.
 Edwin P. Rome, Blank, Rome, Klaus & Comisky, Philadelphia, Pa. (Goncer M. Krestal, Philadelphia, Pa., on the brief), for appellees.
 Before GANEY, VAN DUSEN and ALDISERT, Circuit Judges.
 OPINION OF THE COURT
 ALDISERT, Circuit Judge.
 
 
 1
 These diversity appeals, which challenge the validity of a termination clause in a pension plan, require that we predict, in the absence of holdings directly on point, a choice of law ruling by the Pennsylvania Supreme Court and a substantive law determination by the state to which we are referred.
 
 
 2
 In 1943, Lee Rubber and Tire Corporation[1] executed an agreement of trust which established a non-contributory pension plan for certain of its salaried officers and employees in Ohio and Pennsylvania. Benefits payable to each participant after retirement were to be funded by the purchase of individual insurance contracts, with monies payable by Lee to the Chase National Bank of New York as trustee. The plan was amended in 1956[2] to liberalize pension benefits for Lee employees. The mode of payment of these increases, however, differed for employees over and those under age 51 at the time of the amendment. For the younger group, Lee purchased a group annuity contract; upon retirement the older employees were to receive direct payments from the company on a 'pay as you go' basis.[3]
 
 
 3
 In 1962, following the installation of a new management group, Lee terminated the plan.[4] In so doing, it also terminated the direct payments to the older employees. Thus, while all employees continued to receive their funded pensions, those to whom the increased benefits were to be paid directly never received the benefits which accrued after the 1956 Amendment.
 
 
 4
 Two diversity suits were instituted by these employees against Lee and were tried simultaneously in the district court. One action, brought by those who had retired prior to the termination, was tried to a jury. The other, involving those retired subsequent to Lee's cancellation of the plan, was submitted for a non-jury trial. Giving effect to a specific choice of law provision contained in the Agreement,[5] stating that the provisions shall be construed according to New York law, the district court in both cases applied the substantive law of New York under which it found the termination article valid. In addition, the court found there was insufficient evidence to submit to the jury on the issue of promissory estoppel. Accordingly, Lee was successful in obtaining a directed verdict in the jury case, Boase appeal No. 18,707, and a dismissal in its favor in the bench trial, Howley appeal No. 18,708. Plaintiffs in both actions have appealed.
 
 I.
 
 5
 Because these diversity actions were instituted in a federal court in Pennsylvania, the choice-of-law rules of that state must determine the appropriate body of substantive law. Klaxon Co. v. Stentor Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).
 
 
 6
 Conflict of laws principles generally are not offended by the application of a contractual choice of law provision, see Bouton v. Litton Industries, Inc., 423 F.2d 643 (3 Cir. 1970); Lebeck v. William A. Jarvis, Inc., 145 F.Supp. 706, 727 n. 67 (E.D.Pa.1956), and our research has disclosed no Pennsylvania policy to the contrary. Indeed, a district court in Pennsylvania unhesitatingly recognized the validity of such a provision in a recent diversity pension plan case. Genevese v. Martin-Marietta Corp., 312 F.Supp. 1186 (E.D.Pa.1969). Nevertheless, appellants urge that we decline to give effect to the provision here.
 
 
 7
 Appellants contend that Pennsylvania has embraced the 'grouping of contacts' principle as its choice-of-law rule in contract actions. They press the application of Griffith v. United Air Lines, Inc., 416 Pa. 1, 203 A.2d 796 (1964), which provided that in tort actions Pennsylvania courts will apply the substantive law of the state most intimately concerned with the outcome of the litigation. Appellants note that Griffith cites with approval the New York case of Auten v. Auten, 308 N.Y. 155, 124 N.E.2d 99 (1954), in which Judge (now Chief Judge) Fuld rejected the inflexibility of the traditional lex loci contractus rules and adopted instead the 'grouping of contacts' theory as the controlling choice of law rule in New York contract actions.
 
 
 8
 It is significant that the separation agreement in Auten, unlike the pension plan before us, did not contain a contractual choice of law provision. Even putting this consideration aside, however, and with no intent to deprecate the interest-oriented approach, we conclude that Pennsylvania would not extend the grouping of contacts rule to the facts before us.
 
 
 9
 In the six years since Griffith was decided, the Pennsylvania Supreme Court has not applied its rule in a contract case.[6] That state's intermediate appellate court, in the post-Griffith case of Crawford v. Manhattan Life Ins. Co., 208 Pa.Super. 150, 221 A.2d 877 (1966), explicitly grounded its decision on the traditional conflict of laws rule: 'Under the traditional Pennsylvania rule the construction of a contract is governed by the law of the state where the contract was made.' Id. at 880. It made only supplemental reference to the newer grouping-of-contacts theory: 'The result would be the same even if the standards enunciated in Griffith * * * are applied in this case.' Id. at 881.[7]
 
 
 10
 Our court's decisions in Mannke v. Benjamin Moore & Co., 375 F.2d 281 (3 Cir. 1967) and Goulding v. Sands, 355 F.2d 230 (3 Cir. 1966) do not, as appellants insist, indicate the adoption of the grouping of contacts theory in Pennsylvania contract actions. Because Mannke and Goulding arose from tort actions involving automobile collisions, the evaluations of the state interests described in Griffith were entirely appropriate for the purpose of applying a proper conflict of laws rule. Moreover, in Goulding we explicitly refused to base the application of Pennsylvania law on any choice of law rule, and instead grounded our decision on estoppel. 355 F.2d at 232.
 
 
 11
 We therefore conclude that Pennsylvania's highest court has not so clearly embraced the grouping-of-contacts theory as to set aside a choice of law provision explicitly set forth in the written agreement which is the subject matter of the dispute.
 
 
 12
 Appellants also seek to avoid the application of New York law by urging that the agreement's choice-of-law provision is an adhesion contract and, as such, should be excised. They argue that there was no bargaining in fact between Lee and the participants, that the agreement was actually negotiated between Lee and the trustee, and that appellants became parties merely by 'signing up for the plan' at Lee's plants. They emphasize that even Lee's witnesses conceded that the participants in the plan 'had no choice' but to accept the agreement as prepared or to reject the plan entirely.
 
 
 13
 The originator of the term 'adhesion contract' ('contrat d'adhesion') defined such agreements as those
 
 
 14
 in which one predominant unilateral will dictate its law to an undetermined multitude rather than to an individual * * * as in all employment contracts of big industry * * * and all those contracts which, as the Romans said, resemble a law much more than a meeting of the minds.[8]
 
 
 15
 Although the term is often applied to contracts which contain wholly unconscionable provisions, some writers continue to consider the absence of negotiation, rather than the presence of unconscionability, as the hypostasis of an adhesion contract.[9] Proceeding from this premise, Professor Ehrenzweig would, as a general rule, refuse to enforce choice-of-law provisions which are imposed by one party upon the other.[10]
 
 
 16
 The Pennsylvania Supreme Court has, to a limited degree, recognized the concept of the adhesion contract. See Kotwasinski v. Rasner, 436 Pa. 32, 258 A.2d 865 (1969), and the concurring opinion of Mr. Justice Roberts in Galligan v. Arovitch, 421 Pa. 301, 219 A.2d 463 (1966). This recognition, however, has been restricted to provisions in leases containing exculpatory clauses. Because of its restricted and relatively recent recognition of this doctrine, we are not persuaded that the Pennsylvania Supreme Court would accept appellants' contention that this choice-of-law provision was an adhesion contract. On the contrary, we conclude it would respect the written expressed desires of the signatories to the agreement and choose New York law as the governing substantive law. Accordingly, we turn now to the substantive law of New York. Klaxon Co. v. Stentor Mfg. Co., supra.
 
 II.
 
 17
 Because there exists no New York Court of Appeals decision which is dispositive of the issue before us, we turn again to the teaching of Commissioner of Internal Revenue v. Estate of Bosch, 387 U.S. 456, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967): 'federal authorities must apply what they find to be the state law after giving 'proper regard' to relevant rulings of other courts of the state. In this respect, it may be said to be, in effect, sitting as a state court.'
 
 
 18
 Early New York cases followed the 'gratuity theory' embraced in McNevin v. Solvay Process Co., 32 App.Div. 610, 53 N.Y.S. 98, affirmed, 167 N.Y. 530, 60 N.E. 1115 (1901), holding that pension plans were no more than inchoate gifts. As gratuities, they were subject to modification and termination by the employer at any time and without reference to the terms of the agreement. Dolge v. Dolge, 70 App.Div. 517, 75 N.Y.S. 386 (N.Y.Sup.Ct.1902); Burgess v. First Nat'l Bank, 219 App.Div. 361, 220 N.Y.S. 134 (N.Y.Sup.Ct.1927). See generally 42 A.L.R.2d 461-464. The viability of this gratuity theory was reaffirmed by the New York Supreme Court, a trial court, as recently as 1957 in Kravitz v. Twentieth Century Fox Corp., 5 Misc.2d 368, 160 N.Y.S.2d 716, 720 (N.Y.Sup.Ct.1957):
 
 
 19
 It seems clear that the scheme of the Retirement Plan is simply a promise on the part of defendants to give to specifically described and qualified employees a certain sum in the future with a reservation that it may at any time determine not to complete the gift. If, as here, the employer so determines no employee has any right to recover any sum.
 
 
 20
 Subsequent lower court cases in New York have rejected the gratuity theory. It is on one such case, Scoville v. Surface Transit Incorp., 39 Misc.2d 991, 242 N.Y.S.2d 319 (N.Y.Sup.Ct.1963), that appellants place primary reliance. The court in Scoville stated:
 
 
 21
 Each plaintiff performed the acts and completed the service stipulated in the unrevoked, unmodified promise of their employer and under the modern view thereupon consummated a unilateral contract which vested in each an indefeasible right to the promised benefits.
 
 
 22
 Id. at 321.
 
 
 23
 The Scoville court found McNevin and its progeny 'readily distinguishable in that the plaintiff-employee in each of those cases had only an inchoate gift at the time of his severance from employment, because he had not completed the service or performed the acts stipulated in the promise of the defendant as conditions precedent to vesting of the right to receive pension benefits.'
 
 
 24
 Unfortunately, Scoville does not disclose whether the pension agreement reserved to the employer a unilateral power to amend or terminate; moreover, a subsequent New York trial court decision indicates that the power to terminate such pension plans is valid. Connors v. Howard Stores Corp., 23 A.D.2d 686, 257 N.Y.S.2d 608 (N.Y.Sup.Ct.1965). Assuming arguendo, however, that the court in Scoville did find vested rights despite an express reservation of the power to terminate, this trial court decision is not an expression of the highest appellate tribunal in New York. Moreover, its precedental value is considerably diluted by a subsequent New York Court of Appeals case, Gitelson v. Dupont, 17 N.Y.2d 46, 268 N.Y.S.2d 11, 215 N.E.2d 336 (1966) which substantially narrows the rights of pensioners without mentioning Scoville. In Gitelson, where the employees' rights to pensions were also conditional, the court observed that 'an employee's right to receive payment under the plan is a conditional contract right, and when the plaintiff became a party to the contract by taking employment under it it was bound by these conditions.'
 
 
 25
 In like manner, appellants were possessed of 'conditional contract right(s)' under the plan before us. So long as the agreement remained in effect, without amendments, and prior to termination, the plaintiffs possessed enforceable contract rights against Lee. At that point in time the pension plan, with all its provisions, was binding upon Lee. The Company could not have refused direct payments to any qualified pensioner until the entire plan was either amended or terminated. But the contract was not absolute; it contained 'conditions.'[11] among which was Lee's right to terminate the plan. This right, when duly exercised, constituted an operative condition subsequent which totally extinguished Lee's obligation under the Trust Agreement.
 
 
 26
 Thus, though appellants strenuously urge that, at least as to those appellants who had completed their employment, the conditions of the contract were fulfilled and Lee's obligations became absolute, no such 'express condition,' Restatement, Contracts 252, is to be found within the body of the instrument itself. In its absence, we may not supply such a condition. We may not rewrite the contract. As the court noted in Conner v. Phoenix Steel Corp., 249 A.2d 866, 868 (Del.1969):
 
 
 27
 it is, of course, axiomatic that a court may not, in the guise of construing a contract, in effect rewrite it to supply an omission in its provisions. If it is clear that there is in fact a basic omission which gives the employee no rights under a pension plan, then the employee's claim must fall. It is only when there is an ambiguity in the plan, itself, that a Court may construe it to determine the true meaning.
 
 
 28
 See Reilly v. Walker Bros., 425 Pa. 1, 229 A.2d 457, 462 (1967).
 
 
 29
 Lee reserved to itself in clear and unambiguous language formidable powers under Articles XII and XIII, and when it exercised those powers, Lee's obligations to make any additional payments terminated. These powers could be exercised at will.[12] To interpret such an instrument is not to judge whether it was fair and equitable or harsh and unjust. It is for the court only to delineate what rights and privileges the signatories or the beneficiaries do or do not possess according to the terms contained within the four corners of the agreement. We find no countervailing public policy in New York state, by statute or case law,[13] which overrides the orthodox principles governing the interpretation of contracts.[14]
 
 
 30
 Moreover, the substantive law of New York follows the majority of jurisdictions in the traditional interpretation of pension plan contracts. Hurd v. Illinois Bell Tel. Co., 234 F.2d 942, 943 (7 Cir. 1956); Reilly v. Walker Bros., supra; Conner v. Phoenix Steel Corp., supra; Voigt v. South Side Laundry & Dry Cleaners, Inc., 24 Wis.2d 114, 128 N.W.2d 411 (1964); Hunter v. Sparling, 87 Cal.App.2d 711, 197 P.2d 807 (1948). See 42 A.L.R.2d 461.
 
 
 31
 We therefore conclude that appellants ceased to possess any enforceable rights against Lee once the company elected to put into effect the amending and terminating conditions expressly set forth in the instrument.
 
 III.
 
 32
 One point remains. Appellants argue that the doctrine of promissory estoppel bars Lee from terminating the plan, and that there was sufficient evidence presented at trial to submit this issue to the jury. Although not unmindful that, in reviewing a directed verdict, we must construe the evidence most favorably to appellants, Sano v. Penna. R.R. Co., 282 F.2d 936 (3 Cir. 1960), we nonetheless concur in the district court's finding that appellants' evidence on the estoppel question was insufficient as a matter of law.[15]
 
 
 33
 The Restatement, Contracts, 90 defines promissory estoppel as follows:
 
 
 34
 A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.
 
 
 35
 Appellants have failed to demonstrate any reliance on the ostensible promises of Lee. Indeed, such a showing would be extremely difficult, since all the appellants, nearly 60 years of age, were in the twilight of their careers with Lee when the increased benefits were originally authorized. Appellants would have to show that they forbore seeking or accepting other employment from 1956 to 1962 because of the increased pension benefits, while in fact most had been with the Company for more than 25 years before the 1956 Amendment was enacted. To meet this difficult burden, appellants placed only seven of their number on the stand. None testified as to the reliance of the remaining 56 plaintiffs; only three witnesses testified that they had either remained in Lee's employ in reliance on the pension plan or that, in managerial capacities, they had used the plan as an inducement to others to reject job offers from Lee's competitors. Of these three, witnesses Ikirt and Nellen acknowledged a complete awareness of the terms of the plan including the termination provision; witness Andersen stated simply: 'Well, I read where they could be terminated, but I didn't believe it.'
 
 
 36
 Upon a review of the evidence we conclude that there was insufficient evidence to submit the promissory estoppel to the jury: A fortiori, the doctrine was not established as a matter of law.
 
 
 37
 Accordingly, we hold that the pensioners' rights terminated upon the due exercise by Lee of the powers vested in it by Articles XII and XIII of the Agreement.
 
 
 38
 The judgments of the district court will be affirmed. Each party will bear his own costs.
 
 
 
 [1]
 Lee National Corporation is the successor to Lee Rubber & Tire Corporation. Lee Rubber, a corporation chartered in New York, has sold its manufacturing facilities and is no longer an operating company
 
 
 [2]
 Article XII of the Agreement reserves to Lee the right to amend:
 Except as hereinafter provided, the Company, by resolution of the Board of Directors certified to the Trustee, shall have the right to amend this Agreement and the trusts hereby created at any time and from time to time, to any extent that it may deem advisable.
 
 
 [3]
 Article III, 2. (c) (iv) of the 1956 Amendment provides:
 (iv) Any excess of the benefits to which such employee becomes entitled on retirement over the amount of monthly life income which he was entitled on June 30, 1956 to have provided for him, shall not be funded but shall be paid currently by the Company as such benefits become due.
 
 
 [4]
 Article XIII of the Trust Agreement provides:
 
 
 [1]
 The trusts hereby created are purely voluntary on the part of the Company, and the Company may change, suspend, or discontinue payments hereunder at any time or from time to time as the Company may decide. * * *
 
 
 [2]
 The Company expressly reserves the right to terminate the trusts hereby created
 
 
 [5]
 Article XIII declares:
 
 
 [3]
 The validity of this Agreement or of any of the provisions thereof shall be determined under and shall be construed according to the laws of the state of New York
 
 
 [6]
 Though In re: Adoption of Hunter, 421 Pa. 287, 218 A.2d 764 (1966) did cite Griffith in a cursory discussion of relevant state contacts, there was 'no choice of law problem' in the case. Hunter, an adoption case in which the child, her natural parents, and her adoptive parents were all residents of Pennsylvania, only tangentially presented a conflicts of laws problem (the consent forms were signed in West Virginia). Moreover, the court clearly expressed an overriding Pennsylvania public policy regarding adoption, which it deemed dispositive of the case
 
 
 [7]
 'State law as announced by the highest court of the State is to be followed.' Commissioner of Internal Revenue v. Estate of Bosch, 387 U.S. 456, 465, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1966), Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). When a federal court is without the guidance of a definitive ruling from the state's highest court, it must ascertain the state law 'from all the available data,' Klaxon Co. v. Stenton Mfg. Co., supra, quoting Mr. Justice Stone in West v. American Telephone and Telegraph Co., 311 U.S. 223, 61 S.Ct. 179, 85 L.Ed. 139 (1940). Intermediate appellate decisions are 'data' to be considered as guidelines in the federal court's deliberations. Bosch, supra, 387 U.S. at 465, 87 S.Ct. 1776
 
 
 [8]
 Saleilles, De La Declaration De Volonte, 229
 
 
 [9]
 Arbittier, The Form 50 Lease: Judicial Treatment of an Adhesion Contract, 111 U.Pa.L.Rev. 1197; Oldfather, Toward a Usable Method of Judicial Review of the Adhesion Contractor's Lawmaking, 16 Kans.L.Rev. 303; Ehrenzweig, Adhesion Contractors in the Conflict of Laws, 53 Col.L.Rev. 1072
 
 
 [10]
 Ehrenzweig, supra, n. 9 at 1084
 
 
 [11]
 A 'condition' is an 'operative fact that will create some new legal relation or (2) words or other manifestations that indicate that a fact shall have such operation.' Restatement, Contracts, 250, Comment a
 
 
 [12]
 Such an interpretation does not mean that the parties were engaged in a wholly illusory agreement. Appellants present the facially appealing argument that to give approbation to the termination clause would render the contract a mere gratuity. Lee could be excused of its obligations through the mechanics of a virtual tautology: Lee's obligations terminate when Lee terminates its obligations. As the cases of several jurisdictions suggest, arbitrary action, or termination in bad faith will not be supported by the courts. Russell v. Princeton Laboratories, Inc., 50 N.J. 30, 231 A.2d 800 (1967); Forrish v. Kennedy, 377 Pa. 370, 105 A.2d 67 (1954); Montgomery Ward & Co. v. Reich, 131 Colo. 407, 282 P.2d 1091 (1955). Yet even if we were to follow this line of cases, appellants have failed to sustain their burden of demonstrating the presence of such bad faith. See Gitelson, supra. Indeed, in light of Lee's subsequent withdrawal from the tire manufacturing industry, exercise of the termination power was perhaps financially required
 
 
 [13]
 Cf. Ohio: Cantor v. Berkshire Life Ins. Co., 171 Ohio St. 405, 171 N.E.2d 518 (1960); Sheehy v. Seilon, Inc., 10 Ohio St.2d 242, 227 N.E.2d 229 (1967); New Jersey: N.J.S.A. 14A:8-4
 
 
 [14]
 The common or normal meaning of language will be given to the words of a contract unless the circumstances show that in a particular case a special meaning should be attached to it. Ordinary language may bear locally an extraordinary meaning in some circumstances, but in the vast majority of cases it does not. Restatement, Contracts 235(a); technical terms or words of art will be given their technical meaning. Restatement, Contracts 235(b); the writing will be read as a whole, and every part will be interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general purpose. Restatement, Contracts 235(c); the circumstances under which a writing was made may always be shown. The question the court is seeking to answer is the meaning of the writing at the time and place when the contract was made. Restatement, Contracts 235(d)
 
 
 [15]
 Appellants introduced in evidence pamphlets and leaflets distributed to employees by the company, supplemented by oral assurances by its officers, to the effect that the pensions were payable for life
 Yet at the time the plan was announced, the employees were advised: 'While the Company confidently expects to continue the necessary payments in the future, it must however reserve the right to change or even discontinue the plan if future conditions should necessitate such action.' Similar caveats periodically were brought to the employees' attention. Employees were explicitly admonished that their rights and benefits were governed by the plan itself, copies of which were always available to eligible employees. Indeed, the company was quite forthright with its employees: 'In offering this pension plan to employees, the Company has made every effort to develop a plan which will best safeguard the participants' interests and which will meet future conditions insofar as they can be anticipated at the present time. The Company confidently expects to continue the plan indefinitely, but necessarily reserves the right to change, modify, or discontinue the plan at any time, if in its absolute and uncontrolled discretion, it deems such change, modification, or discontinuance necessary or desirable.'