(576 P 2d 245)
No. 49,061

RALPH MOORE, *et al., Appellants,* v. CHARLES Q. ADKINS, *et al., Appellees.*

Opinion filed March 31, 1978.

*John R. Morse* of Fleeson, Gooing, Coulson & Kitch, of Wichita, for the appellants.

*Thomas C. Triplett* and *Martin W. Bauer* of Martin, Pringle, Schell & Fair, of Wichita, for the appellee L. J. Holgerson.

*Gerald E. Weaver* and *Artie E. Vaughn* of Vaughn, Updegraff, Allison & Holloway, of Wichita, for the appellee Pete Alford.

Before REES, P.J., SPENCER and PARKS, JJ.

SPENCER, J.: This is an action commenced by the plan committee and the corporate trustee of a qualified employee benefit plan, seeking court instructions for the distribution of trust funds upon termination of the plan incident to the dissolution of the corporate employer.

On March 27, 1961, Sam P. Wallingford, Inc., adopted a pension plan, effective that date, for the benefit of its employees. Eligibility was extended to every full-time non-union employee who had been in the service of the company for one year or longer. The plan was funded entirely by contributions from the company to the trustee designated in a separate trust instrument.

On February 6, 1974, the board of directors of the company adopted a plan of liquidation which was approved by the stockholders on February 26, 1974. Thereafter, a sale of the operating assets of the company was negotiated resulting in an agreement entered into under date of April 30, 1974. The closing date specified in that agreement was May 1, 1974, and all company

employees were terminated as of that date. The fiscal year of the company ended March 31, 1974.

By the terms of the plan, the company-employer agreed to make an annual contribution to the trustee of an amount determined each year by the board of directors within upper and lower limits as certified by the plan actuary. Such a contribution was made each year over the life of the plan although there was evidence that the provisions to ascertain the amount of the contribution each year were not strictly adhered to. However, for at least the years 1971, 1972, and 1973, the company had made an annual contribution of $35,148. During fiscal year 1973-1974, the company had accumulated one-twelfth of that amount each month in anticipation of a contribution to be made as of March 31, 1974.

On March 28, 1974, plaintiff Ralph Moore, as president of the company, directed transfer of the sum of $35,148 to the trustee. He stated that he did so pursuant to his efforts to get everything wound up as much as possible by March 31 and, since that item was on the statement for the company, he assumed it was to be paid as it had been the year before. Although Moore was a member of the board of directors, the board had not expressly authorized the contribution for that year.

In August, 1974, Moore was told by the company attorney, who was neither an officer nor a director, that the contribution should not have been made. Sometime thereafter, Moore talked to the trustee concerning the matter and in April, 1975, the funds so contributed were returned to the company by the trustee in response to a written request from the company.

There is no evidence that the plan was ever terminated by formal resolution pursuant to its terms, nor that the plan terminated for failure to make a necessary contribution. § 8.5(b) provides that, in the event of the sale or dissolution of the company without continuation of the plan, it shall be mandatory for the board of directors and the plan committee to terminate the plan as provided by § 8.3. That section provides that, in the event of termination, the plan committee, as of the first March 31 accounting date thereafter, shall instruct the trustee that the trust fund held by the trustee shall be gradually liquidated "to pay benefits as provided under the Pension Plan, with priorities as follows: 1. Pensioners and Beneficiaries who are already receiving benefits, and Participants eligible for normal retire-

ment. 2. Participants eligible for early retirement. 3. All other Participants."

This action was commenced October 25, 1974. All participants, past participants, pensioners, and beneficiaries of the plan were made parties defendant. Several answered, but only defendants L.J. Holgerson and Pete Alford are appellees.

On July 23, 1975, while the present action was still pending, the plan committee issued its final instructions to the trustee for distribution of the pension funds. In accordance with § 8.3 of the plan, each participant was placed in one of the three priority groups and individual entitlements were determined. On July 29, 1975, plaintiffs filed a motion for approval of such final instructions. On September 19, 1975, the trial court entered its order of approval. On that same day, Holgerson filed a motion to set aside the order of approval, which was subsequently joined by Alford. Apparently they are the only two defendants to take exception to the proposed final instructions. On September 26, 1975, the trial court set aside its order of approval as to Holgerson and, on October 21, 1975, as to Alford.

Holgerson had been a long-time employee of the company and became a participant under the plan on the date it became effective. In 1968 he became company president but was removed from that office and his employment was terminated on July 31, 1973. At the time his employment was terminated, Holgerson was fifty-six years of age and had thirty-eight years of continuous service with the company. As such, he was eligible under § 11.3 to apply for early retirement. § 11.8(c) of the plan provides:

" . . . [A]ny Participant whose employment was so severed after such Participant was eligible to apply for Early Retirement shall be entitled to payment under the provisions of paragraph 11.8(b) hereof, of a severance benefit in an amount which is the actuarial equivalent of the Early Retirement Pension . . . ."

§ 11.8(b) provides that the severance benefit be held by the trustee until "the third March 31 date subsequent to severance" and at that time be paid over to the severed participant in one lump sum. Thus, Holgerson's lump sum severance benefit was payable on March 31, 1976, a date after termination of the plan on April 30, 1974. The proposed instructions of the plan committee did not provide for Holgerson's lump sum severance benefit. Instead, Holgerson was placed in priority group two, *i.e.,* those

"eligible for early retirement." As such, he was assigned a monthly benefit for life, provided that all benefits for those in priority group one had been paid and provided further that, if funds were insufficient to pay the assigned benefit to all those in priority group two, the benefit to each of that group would be reduced proportionately.

Alford had also been placed in priority group two but prior to trial he settled with plaintiffs and was placed in priority group one. The only issue on appeal involving Alford is the allowance of $3,500 for his attorney's fee.

By pre-trial order, the propriety of the trustee's return to the company of the March, 1974, contribution was also made an issue. The trial court found that the contribution had been improperly returned to the company and surcharged the trustee in the amount of $35,148. The trial court held that Holgerson was entitled to the lump sum severance benefit, stating:

" . . . The Court finds that defendant Holgerson, except for his rights as a terminated participant pursuant to paragraph 11.8, would be properly classified as to the priorities under the Plan in Group No. 2. However, the Court finds that defendant Holgerson is entitled to a lump sum distribution, and such payment became due and payable as of March 31, 1976; and the Court makes the further finding that defendant Holgerson is entitled to such lump sum payment from the funds of the Plan in an amount as determined by the provisions of paragraph 11.8."

The trial court also awarded Holgerson his attorney's fee and entered a finding that the determination of the plan committee as to Holgerson's status and rights under the plan had been made in good faith.

Plaintiffs have appealed contending that it was error for the trial court to substitute its judgment for that of the plan committee by concluding that Holgerson was entitled to a lump sum severance benefit, in surcharging the trustee for the amount of the March, 1974, contribution, and in awarding Alford and Holgerson their attorneys' fees.

In support of their contention that Holgerson is not entitled to payment from the pension fund of a lump sum severance benefit, plaintiffs argue that § 8.3, *supra,* provides the exclusive method of distribution upon termination of the plan. Thus, severed employees who had not then received their deferred lump sum severance benefit must necessarily fall within group three, "All other Participants." It is only because Holgerson was eligible for

early retirement at the time of his severance that he was placed in group two. Plaintiffs also argue that § 6.9, which provides that the plan committee shall have power to determine all questions as to the "status and rights" of participants, and § 6.7, which provides that any determination by the plan committee shall be "final and conclusive," as well as § 10.2, which provides that any interpretation of the provisions of the plan document made by the plan committee "in good faith shall be binding upon" all persons acquiring or claiming rights to any part of the trust fund, preclude court review of the acts of the plan committee beyond a determination of good faith.

We agree with plaintiffs in that judicial review of a decision properly within the discretion of the plan committee is limited to a determination of whether the committee has been arbitrary or has acted in bad faith or in a fraudulent manner. See, *Wyper v. Providence Washington Ins. Co.,* 533 F.2d 57 (2d Cir. 1976); *Miller v. Associated Pension Trusts, Inc.,* 541 F.2d 726 (8th Cir. 1976). The rule parallels that in Kansas and elsewhere as to judicial review of a trustee's discretion. *Jennings v. Murdock,* 220 Kan. 182, Syl. 1, 553 P.2d 846 (1976). Since the trial court found that the determination of the status and rights of Holgerson had been made in good faith, we are faced with the question of whether Holgerson's right to the payment of a lump sum severance benefit is a matter properly within the discretion of the plan committee.

Holgerson argues that § 8.3 does not apply to his lump sum benefit, which was determined prior to the termination of the plan, and that the section merely determines priorities among those receiving periodic payments from the trust. He also argues that his right to the lump sum benefit had "vested" prior to termination and could not, therefore, be defeated either by the termination of the plan or by the exercise of the committee's discretion as to "status and rights." To determine the question we must consider the plan document.

The weight of recent authority holds that, as to employees who continue in their employment for the requisite period of time, a private non-contributory pension plan is a contractual obligation of the employer. Compare, *Jacoby v. Grays Harbor Chair & Mfg.,* 77 Wash. 2d 911, 468 P.2d 666 (1970); *Graham v. Hudgins, Thompson, Ball & Associates, Inc.,* 540 P.2d 1161 (Okla. 1975);

*Southwestern Bell Tel. Co. v. Gravitt,* 551 S.W.2d 421 (Tex. Civ. App. 1976); with *Friedman v. Romaine,* 77 Misc. 2d 134, 352 N.Y.S.2d 351 (Sup. Ct. 1974). See generally, Anno. 42 A.L.R.2d 461 (1955) and particularly the Later Case Service thereto. Under the view that the pension plan is a contract, it has been held that the rights of employees who have qualified for benefits under the terms of the plan may not be defeated by the exercise of discretionary power, retained by the employer, to terminate the plan. *Cantor v. Ins. Co.,* 171 Ohio St. 405, 171 N.E.2d 518 (1960); *Ellis v. Emhart Mfg. Co.,* 150 Conn. 501, 191 A.2d 546 (1963); *Delaware Trust v. Delaware Trust,* 43 Del. Ch. 186, 222 A.2d 320 (1966); *Stopford v. Boonton Molding Co., Inc.,* 56 N.J. 169, 265 A.2d 657 (1970). All of these cases, however, deal with the contractual obligation *of the employer* to provide the pension payment when the plan, upon termination, lacks sufficient funds to do so. Other cases have given effect to specific provisions of the plan involved which limit the employer's liability to contributions already made upon termination of the plan. *Baake v. General American Transportation Corporation,* 351 F. Supp. 962 (N.D. Ill. 1972); *Hauser v. Farwell, Ozmun, Kirk & Company,* 299 F. Supp. 387 (D. Minn. 1969); *Boase v. Lee Rubber & Tire Corporation,* 437 F.2d 527 (3rd Cir. 1970) (applying New York law).

Under the posture of this case, however, we need not decide whether Holgerson has an enforceable right against the company for the full amount of his lump sum severance benefit. The company is not a party to the case. At issue is only whether Holgerson is entitled to the full amount of his lump sum severance benefit *from the pension fund* upon termination of the plan. Under familiar rules for the construction of written instruments, we conclude that he is not.

Where the provisions of a written instrument are clear and unambiguous, there is no occasion for applying rules of construction. *Desbien v. Penokee Farmers Union Cooperative Association,* 220 Kan. 358, 363, 552 P.2d 917 (1976). Here, however, an examination of the pension plan, specifically § 8.3 and § 11.8, reveals sufficient ambiguity and conflict to justify application of established rules of construction.

A written instrument is to be interpreted from its four corners, and all language used anywhere in the instrument should be

taken into consideration and be construed in harmony with other provisions. *Gibbs v. Erbert*, 198 Kan. 403, 424 P.2d 276 (1967). The meaning of a written instrument should be ascertained by consideration of all the pertinent provisions and never by a critical analysis of a single or isolated provision. *Weiner v. Wilshire Oil Co.*, 192 Kan. 490, 389 P.2d 803 (1964). When a written instrument is ambiguous, the intent of the parties is not ascertained by resort to literal interpretation but by considering all language employed, circumstances existing when the instrument was made, objects sought to be attained, and other circumstances, if any, which tend to clarify the intent of the parties. *Amortibanc Investment Co. v. Jehan*, 220 Kan. 33, 551 P.2d 918 (1976).

Applying these rules to the plan here involved, it becomes clear that § 8.3 and § 11.8 must be read together. Holgerson's entitlement under § 11.8 to the deferred benefit cannot be viewed in isolation from the provisions of § 8.3, specifically indicating priorities of distribution upon termination of the plan. § 11.8 does not indicate what effect termination will have upon the deferred payment. We conclude that the plan, by its terms, provides that Holgerson's right to the deferred benefit is subject to the possible termination of the plan prior to the date his severance benefit otherwise would be paid.

This interpretation is reasonable and consistent with the purpose of the plan. At the time of termination, Holgerson was not the only former employee who had met all the requirements of the plan for entitlement to benefits. Those who had retired, either under regular or early retirement, were entitled to and receiving benefits. It is possible there were former employees who had qualified for disability benefits. If Holgerson was paid the entire amount of his benefit from the pension fund, he would receive priority over other employees who had also met all the requirements for entitlement. To allow an employee who had been severed from employment priority over employees who continued in their employment until retirement or disability would defeat the purposes of the plan. § 8.3 provides a reasonable preference to those employees who remained with the company until the plan was terminated. Severed employees awaiting their deferred severance benefits were provided for under priority group three (all other participants). If Holgerson had remained with the company until the plan's termination, he would only

have been eligible for group two (those eligible for early retirement). Under the interpretation of the plan he now advances, the fact that he was severed from employment gives him priority even over those in group one (those receiving benefits and those eligible for normal retirement). We do not view this as a reasonable interpretation.

Although a vested right under a pension plan may not be limited or abrogated solely because its payment is deferred, the plan itself may provide for abrogation upon occurrence of a condition between vesting and payment. Far from supporting his position, *Keller v. Graphic Systems of Akron, Inc., Etc.,* 422 F. Supp. 1005, (N.D. Ohio 1976), cited by Holgerson, provides that a deferred benefit may be defeated by intervening competitive activity of the former employee.

We hold that Holgerson's right to a deferred benefit from the trust was subject to the possible termination of the plan prior to the date such benefit was to be paid and, in the event of such prior termination, his rights were governed by the priorities established by § 8.3 of the plan. Having so determined, we hold that placing Holgerson in priority group two was a matter within the discretion of the plan committee and that the trial court erred in adjudging Holgerson entitled to a lump sum benefit to be paid from the trust fund.

Plaintiffs next contend that the trial court erred in surcharging the trustee for its return of the March, 1974, contribution. By definition, surcharge is a remedy designed to make the trust estate whole, primarily where losses have been incurred through the negligence or bad faith of the trustee. *Jennings v. Murdock,* supra, Syl. 14.

Plaintiffs argue that the transfer by Moore to the trustee of the amount accumulated in the pension fund reserve account was by mistake and without authority; that, accordingly, no contribution was ever made; and that the trustee violated no duty in returning the amount to the company.

Holgerson argues that, since the pension plan was not properly terminated until after March 31, 1974, the company had an obligation to make a contribution for the fiscal year ending on that date. Holgerson also argues that the prior course of dealings by the board of directors authorized the company president to make a contribution in the amount transferred in this instance

and that, even if Moore was not authorized to make the contribution, his action in doing so was ratified by the board of directors. He then contends that, since the contribution was properly made and the company had no reversionary interest in the contribution under the plan, the trustee violated its duty under the trust in returning the contribution to the company.

The trial court concluded that the plan terminated on the date of the sale of the company assets and that the company had an obligation to contribute to the pension fund for the fiscal year which ended March 31, 1974. It concluded that the return of the contribution was not proper.

Plaintiffs support their argument that no contribution was ever validly made by citing authorities to the effect that the settlor of a trust may rescind a trust created by him as a result of material mistake. *Flora Appeal (No. 2),* 180 Pa. Super. Ct. 243, 120 A.2d 181 (1956); III Scott, *The Law of Trusts,* § 333.4 (2d ed. 1956); Restatement (Second), Trusts § 333, comment *e,* pp. 150-151. There are two reasons why this rule and plaintiffs' authorities are not pertinent to the present situation. First, what is involved is not the establishment of the trust itself, but an annual contribution to the trust; and, second, the stated authorities recognize:

" . . . [W]here the owner of property receives consideration for making a transfer of the property in trust, the rules applicable to transfers for value and to contracts are applicable, and the fact that the owner made the transfer under a mistake is not of itself a sufficient ground for setting aside the transfer . . . ." Restatement (Second), Trusts § 333, comment *e,* pp. 150-151.

It is only where the creation of the trust is gratuitous that the settlor's unilateral mistake is sufficient ground for rescission. We have already determined that under the modern view private non-contributory pension plans are not gratuities but contractual obligations of the employer. Even if we were to view the establishment of the pension plan here involved to have been gratuitous, the continuation in their employment of the company employees with knowledge of the plan's existence must be held to have transformed the gratuity into a contract by the time of the 1974 contribution.

We agree with plaintiffs, however, that the company was not bound to make a contribution for fiscal year 1974. Although § 12.1 states that the corporation agrees to make a yearly contribution, § 8.2 impliedly allows the company not to do so, as

failure to make a yearly contribution which in turn causes the plan to be actuarially unsound results in automatic termination of the plan. Accordingly, we must conclude that the trial court erred in holding the contribution properly made on this ground.

The real question in this issue is Moore's authority to make the contribution.

, Although the record fails to disclose that Moore had express authority to make the contribution, it does show that he had implied authority. In *Brown v. Wichita State University,* 217 Kan. 279, 540 P.2d 66 (1975), vacated in part on other grounds, 219 Kan. 2, 547 P.2d 1015 (1976), it was stated:

" . . . The test utilized by this court to determine if the alleged agent possesses implied powers is whether, from the facts and circumstances of the particular case, it appears there was an implied intention to create an agency; in which event, the relation may be held to exist, notwithstanding either a denial by the alleged principal or whether the parties understood it to be an agency . . . ." (217 Kan. at 286-287.)

See also, *Gardner v. Rensmeyer,* 221 Kan. 23, 557 P.2d 1258 (1976).

Moore testified that he instructed the treasurer to make the payment as part of his effort to wind up the affairs of the company. At the directors' meeting on February 6, 1974, where it was decided to sell the company assets, a resolution was adopted giving the officers the authority to "take any and all other action which, in the discretion of the officers, is deemed necessary or appropriate in connection [with the liquidation]." Moore was a member of the board of directors himself. He stated that he had ordered the contribution the year before (fiscal year 1973) without express authorization from the board, although the board may have authorized it before he became president in July of 1973. Although he had been a member of the board for a number of years, he did not know if the board had authorized the fiscal year 1973 payment because he was a member in name only and had not been invited to the meetings for two years before becoming president. He further stated that the board of directors looked at the company balance sheet each month and, therefore, knew that one-twelfth of the $35,148 was being accrued each month as a reserve, and that no one objected to that expense. Paul Walling-ford, also a member of the plan committee and a director, testified that the $35,148 payment for 1974 was the same as for 1971, 1972, and 1973. He also stated that the limits of the contribution had

not been certified each year by an actuary, and that the board had not each year gone over whether they should contribute or the amount to be contributed. The usual procedure was that the contribution would be approved informally by the directors, specifically by whoever was in town.

Against such circumstances, it was not until some five months after the payment was made that Moore, a director, was informed by the company attorney, a non-director, that the company would not be making a contribution for fiscal year 1974. There is no evidence that the company attorney spoke for the remaining directors in this matter. In addition, it would appear that, if the directors were faithfully performing their duties and examining the monthly balance sheet each month as Moore testified they did, they should have been aware that a charge had been made against the reserve account accumulated until March 31, 1974, and thus aware that the money had been paid out.

A course of business conduct is sufficient to establish implied authority in an officer to do a certain act. 19 C.J.S., Corporations § 1030, pp. 515-516; cf., Kansas City v. Cullinan, 65 Kan. 68, 68 Pac. 1099 (1902); Livermore v. Ayres, 86 Kan. 50, 119 Pac. 549 (1911). In determining whether the facts establish implied authority, the facts should be viewed most favorably to the party prevailing below. Gardner v. Rensmeyer, supra. We conclude from all of the facts of this case that the directors intended that Moore have the authority to make the contribution in the amount already set aside in the reserve. It follows that the contribution was valid. Therefore, we need not determine whether the contribution was also ratified.

This brings us to the question of whether the trustee was properly surcharged for returning the contribution. § 3.2 of the plan provides in part:

" . . . Upon the transfer by the Employer of any money or other property to the Trustee all interest of the Employer therein shall cease and terminate, the Employer retaining no beneficial or reversionary interest whatsoever in any of the assets, profits, earnings, forfeitures, or increment of the said Trust Fund."

Plaintiffs correctly note that this provision is undoubtedly in the plan to satisfy the dictates of I.R.C. § 401(a)(2) as a requirement of a qualified plan for tax purposes. Nonetheless, the trustee of the fund should be charged with knowledge of the provisions of the plan. The trust officer in charge of the fund testified by

deposition that he was not aware of § 3.2 when he returned the contribution. The question is whether the trustee should be liable to the trust for the amount of the returned contribution.

Under the trust agreement, the trustee had the duty to hold and manage all the funds it received as contributions from the employer (§ 2.1). It had the duty to pay out funds only on the written direction of the plan committee, but in no event was it to pay out funds except for the exclusive benefit of the participants (§ 3.6). Restatement (Second), Trusts § 226, p. 523, provides:

"If by the terms of the trust it is the duty of the trustee to pay or convey the trust property or any part thereof to a beneficiary, he is liable if he pays or conveys to a person who is neither the beneficiary nor one to whom the beneficiary or the court has authorized him to make such payment or conveyance."

The trustee is so liable even though he acts in good faith and under reasonable mistake of law or fact. If he is in doubt as to the proper course, he can apply to a court for instructions. Restatement (Second), Trusts § 226, comment *b*, p. 524, § 201, comment *b*, p. 442; *In re Estate of Woods,* 181 Kan. 271, 311 P.2d 359 (1957); *Coolbaugh, Trustee v. Gage,* 182 Kan. 145, 319 P.2d 146 (1957).

It follows that in this case the trustee is liable for the contribution it incorrectly returned to the company, even though it acted in good faith in doing so.

Finally, it is argued that the trial court erred in allowing attorney fees to Holgerson and Alford. Plaintiffs argue that, if the trial court's order surcharging the trustee is reversed herein, the award of attorney fees should be similarly reversed since the only other issues raised by Holgerson and Alford relate to their personal interests and not to those of the trust as a whole. Since we have concluded that the court correctly surcharged the trustee for return of the 1974 contribution, and since the services of the attorneys for both Alford and Holgerson have proved beneficial to the trust estate, the award of attorney fees is affirmed. 90 C.J.S., Trusts § 261, pp. 321-322. *Cf., Jennings v. Murdock,* supra, p. 215. Holgerson's and Alford's rights to attorney fees are not supported by the Employee Retirement Income Security Act (29 U.S.C. § 1001, *et seq.*). Although their cause of action may not have arisen until July 21, 1975, as found by the trial court, the action was in relation to a pension plan which had terminated on May 1, 1974. As such, the plan was never subject to ERISA,

which for purposes of this case was effective only as to plan years (*i.e.* plan fiscal years) beginning after September 2, 1974. 29 U.S.C. § 1061. Thus, unlike the case of *Keller v. Graphic Systems of Akron, Inc., Etc.,* supra, the plan was never subject to ERISA and no part of this action was governed by its provisions.

This cause is remanded to the trial court with directions to enter judgment in accordance herewith.

Affirmed in part, reversed in part.