INLAND MUTUAL INSURANCE COMPANY, a corporation, Plaintiff,

v.

PEERLESS INSURANCE COMPANY, a corporation, Defendant.

No. 840.

United States District Court
S. D. West Virginia,
Huntington Division.

June 26, 1957.

L. E. Woods, Jr., and C. F. Bagley, Jr., Campbell, McNeer & Woods, Huntington, W. Va., for plaintiff.

Robert W. Lawson, Jr. and Charles W. Yeager, Steptoe & Johnson, Charleston, W. Va., for defendant.

HARRY E. WATKINS, District Judge.

Inland Mutual Insurance Company, hereafter called Inland, has paid $27,500 in settlement of certain litigation and has incurred expenses totalling $11,560.-99 in connection therewith. Under the provisions of a reinsurance treaty between the parties, Inland, a West Virginia corporation, seeks reimbursement for two-thirds of this expenditure, or $26,040.66, from Peerless Insurance Company, a New Hampshire corporation, hereafter called Peerless. The case primarily turns upon a construction of the

reinsurance treaty, and the issues presented to this Court, sitting without a jury, are very narrow: (1) In an action in the Circuit Court of Fairfax County, Virginia, against an insured of Inland, did Inland keep Peerless fully informed of the proceedings in the case, as required by the reinsurance treaty, and to what extent did Peerless participate in the negotiations surrounding that case? (2) Was attorney Charles Pickett, who represented Inland in the defense of the insured in that action, also the agent of Peerless? (3) Does this reinsurance agreement cover a loss of this type, where Inland has paid its insured $27,500 over and above the amount of insurance coverage, as damages for the failure of Inland's agents to use due diligence to settle a case against an insured? Under the evidence of this case, and the law applicable thereto, I find that these questions must be answered in the affirmative, and that Inland must prevail in this action.

### Findings of Fact

On March 28, 1951, while the reinsurance agreement between these parties was in full force and effect, the plaintiff issued a vehicle liability policy to Lota H. Yeatts, T/A Yeatts Transfer Company, of Alta Vista, Virginia, hereafter referred to as Yeatts, or insured. This policy was in the form of the National Standard Automobile Liability Policy, Non-Assessable, in use at that time. Under the terms of that policy, Inland agreed, *inter alia*, to indemnify Yeatts against liability for personal injuries arising out of the operation of the insured's vehicles to the extent of $15,000 for injuries to one person in any one accident. Pursuant to the reinsurance treaty, Inland retained $5,000 of this coverage and ceded to Peerless the excess, forwarding to Peerless the appropriate proportion of the premium paid by Yeatts.

On April 20, 1951, while both the policy described above and the reinsurance treaty between these parties were in full force and effect, a collision occurred in Fairfax County, Virginia, between a truck owned by Yeatts and an automobile driven by one John J. Arms, in which Arms was seriously injured. Inland received a preliminary notice of this accident on April 23, 1951, from the Nichols Adjusting Company, of Washington, D. C., to whom the truck driver had reported the accident. Inland immediately set aside $1,500 on its books as a reserve for the case. A week later, upon receiving a more detailed report from the Nichols agency, Inland increased its reserve to $3,500. After further investigation reports from the Nichols agency, as well as from other sources, on September 21, 1951, Inland increased its reserve to $7,500, and for the first time notified Peerless of the accident, using a "Preliminary Loss Advice" form provided by Peerless.

Thereafter, until February 4, 1952, when Arms filed suit against Yeatts demanding $125,000 damages, six letters passed between Inland and Peerless regarding this accident. In addition to the correspondence, on October 4, 1951, Kellogg P. Sherwood, the assistant secretary of Peerless who handles reinsurance claims, went to the home office of Inland in Huntington, West Virginia, and examined, discussed, and made notes on the Yeatts-Arms collision file, along with some other cases. After Arms filed suit, Peerless was advised by Inland of all the pertinent developments of the case, through several letters and through another visit of Sherwood to Inland's home office. A reading of this correspondence discloses that medical reports, investigation reports, and opinions of counsel, were furnished Peerless.

On February 14, 1952, Inland informed Peerless by letter that Inland had retained the law firm of Barbour, Garnett, Pickett & Keith, of Fairfax, Virginia, to handle the case. While Peerless disagreed with Inland as to the value of the case and whether there was any liability on the part of the defendant, Peerless did not secure independent counsel to participate in the case, although both parties concede that Peerless could have done so, under the terms of the re-

insurance treaty, if Peerless were not satisfied with the manner in which the attorneys retained by Inland handled the case.

Until the date of trial, October 29, 1952, there were no negotiations for settlement of the case, as Arms' attorneys were demanding $60,000 and Inland and Peerless considered that sum much too high. The insured employed attorney Robert J. McCandlish, Jr., of Fairfax, Virginia, as its counsel, and he joined Charles Pickett, of the firm retained by Inland, in defending the case. On the morning of the second day of the trial, after all the evidence was in, Arms' attorney offered to accept $17,500 in full settlement of the action. That figure was in excess of the policy limits of the insured's coverage, so Yeatts agreed to put up $2,500 of this sum if Inland would pay the entire policy coverage of $15,000. McCandlish conveyed this information to Pickett, indicating that he felt the offer should be accepted, and stated to Pickett that if Inland rejected the offer, Yeatts would look to Inland to pay any amount by which the judgment might exceed the $15,000 policy limits. Pickett telephoned Harold G. Talbott, claims supervisor of Inland, at Inland's home office, and advised Talbott of these developments. Pickett stated at that time that he felt that the insured would prevail in the case, or at least the verdict would be low in amount, so that he would be reluctant to recommend paying more than $7,500 in settlement of the Arms' litigation, and was of the opinion that even that sum would be a gift. Talbott discussed the matter with his superiors, who told him to rely upon the advice of his trial attorney, since Pickett was more familiar with the progress of the trial than anyone at the home office. Talbott then called Sherwood, in New York City, and related to him substantially all that had happened. Sherwood consented to the $7,500 figure and Talbott notified Pickett to offer that sum. Pickett offered Arms' attorney $7,500, which was rejected; the case continued and the jury returned a verdict of $75,000, upon which judgment was entered and appeal denied. Inland paid Yeatts $15,000, and was reimbursed by Peerless in the amount of $10,000.

On January 6, 1954, the insured instituted an action against Inland which was removed to the United States District Court for the Eastern District of Virginia, Richmond Division. This action sought $160,000 for damages allegedly sustained as a result of the negligence and bad faith of Inland and its agents in not accepting the $17,500 offer of Arms to settle his action against Yeatts. The alleged damages consisted of $60,000, representing the difference between the $15,000 paid by Inland to Yeatts and the $75,000 judgment against Yeatts, plus $100,000 alleged damage to the business of the insured by reason of attachments levied against the insured's trucks by Arms in an effort to obtain satisfaction of his $75,000 judgment.

Peerless was informed by Inland of this action, but Peerless refused to participate in the defense except for offering suggestions to Inland. After a motion for summary judgment was denied, and the case was set for a jury trial, Inland negotiated an agreement with Yeatts and Arms whereby Inland paid Yeatts $27,500 in full settlement of insured's suit against Inland, which sum Yeatts paid to Arms along with an additional $15,000, in full settlement of Arms' judgment against Yeatts. These payments were in addition to the $15,000 paid by Inland under its policy.

In its complaint in the instant action, Inland asked for full reimbursement from Peerless of the $27,500 paid Yeatts, but at the trial Inland reduced its claim and now seeks two-thirds of that sum, as well as two-thirds of the expenses incurred in the two cases. In its answer, and at the trial, Peerless expressed a willingness to pay its two-thirds share of the expenses in the case of Arms v. Yeatts, when informed of the amount thereof, but denied liability as to the other claims of Inland. Plaintiff has introduced Exhibit No. 19 listing the expenses it incurred in the case of Arms

v. Yeatts, indicating a total of $1,695.37, but one item listed thereon in the amount of $200 includes a notation that the insured paid $50 of that sum while Inland paid only $150. Defendant's Exhibit No. 16 substantiates the fact that the insured paid $50 of the $200 figure, so it appears that Inland's actual expenses in the case of Arms v. Yeatts amounted to $1,645.37. Plaintiff's Exhibit No. 20 lists expenses incurred in the case of Yeatts v. Inland, totalling $9,915.62. In summary plaintiff seeks two-thirds of $27,500, $1,645.37 and $9,-915.62, which aggregate $39,060.99, of which two-thirds is $26,040.66.

Looking at the evidence as it developed in 1951 and 1952, I find that Inland kept Peerless fully and adequately informed of the significant developments in the case of Arms v. Yeatts. A costly error was made in evaluating the Arms claim, but Peerless cannot now be allowed to avoid its share of the loss by pointing out errors of human judgment through the use of hindsight. Peerless stresses the point that the collision of April 20, 1951, was not reported to it until September 21, 1951, although this was a case involving $75,000. However, as the facts trickled into Inland's home office during the intervening five months, in the judgment of Inland's experienced claims men the case was not one involving over $5,000 so that Peerless should be informed. When it became apparent to Inland's officials that the injuries were quite serious, then Peerless was advised of the claim. Reporting the claim to the reinsurer involved human judgment which, when exercised without the benefit of hindsight such as Peerless now uses, I cannot condemn as insufficient.

The record is replete with testimony adduced by the defendant to the effect that in 1951 and 1952, Sherwood of the Peerless Company insisted that Arms v. Yeatts was a dangerous, potentially costly case, but he could not convince Inland's officers of that fact. With such prescience on the part of Sherwood, it is difficult to see how Peerless can now say that it was not sufficiently informed regarding the details of this accident to make a proper decision concerning payment of the full coverage.

Although Peerless did not take part in investigating the accident, or in selecting the law firm to handle the defense of the case, these actions were carried out by Inland for the mutual benefit of Inland and Peerless, as both companies were concerned with a potential loss. The negotiations for settlement of Arms v. Yeatts were carried on through Inland's attorney, Pickett, but again the action taken was for the mutual benefit of both insurance companies. When Pickett reported to Talbott that the case could be settled for $17,500, Inland's officers conferred among themselves and acceded to Pickett's suggestion that not over $7,500 be offered. Pickett was a competent and experienced lawyer in such matters. But before issuing instructions to Pickett, Talbott felt it necessary to call Sherwood because it was Peerless's money that was at stake; whether $7,500 or $17,500 were paid in settlement, only $5,000 of it would come from Inland, for that was Inland's retention under the reinsurance treaty. There is a conflict as to the exact conversation between Talbott and Sherwood on October 30, 1952, even though each man dictated a memorandum of the telephone call at that time, but it is clear that Sherwood was made to understand that the Arms case could probably be settled if the insurance companies would pay the full policy coverage. Sherwood left the matter up to Talbott, and tacitly agreed with a maximum offer of $7,500. Under this evidence, I find that Peerless actively participated in the negotiations for settlement of the Arms litigation. It was Peerless which stood to gain if the $7,500 offer were accepted by Arms; the rejection of Arms' $17,500 offer was made for Peerless's benefit, with Sherwood's knowledge and consent.

Peerless urges that Inland had a definite interest in keeping the Arms loss down to $7,500 because of a provision in the reinsurance agreement that Inland was to receive a 15 per cent contingent

commission on net profits accruing to Peerless on business covered by the reinsurance contract. Peerless has introduced no evidence, however, from which the Court can find that a savings of $7,500 on this one loss would have resulted in a commission to Inland of any amount; there could have been a net loss in that year which would not have been eradicated by even a $7,500 savings. There is no evidence in this case to show that Inland had anything to gain by rejecting the $17,500 offer. In fact, Inland would have been responsible for an additional one-third of the $1,645.37 costs and expenses of the trial if the $7,500 offer had been accepted by Arms, for expenses were paid by the companies in direct proportion to the amount of loss paid and if $7,500 were paid Inland's $5,000 would constitute two-thirds of the loss, whereas when $15,000 was paid Inland's portion was only one-third of the loss.

### Conclusions of Law

The pertinent provisions of the reinsurance treaty of August 6, 1947, between these parties are these ("Company" is Inland; "Reinsurer" is Peerless):

#### "Article III

#### "Liability of Reinsurer:

"The actual payment by the Company of any loss shall be a condition precedent to any recovery under this Agreement, and subject to such condition, the liability of the Reinsurer shall follow that of the Company in every case and shall be subject in all respects to all the general and special stipulations, clauses, waivers and modifications of the Company's policy, binder or other undertaking, and any endorsements thereon.

"No error or omission in reporting any risk reinsured or marked to be reinsured shall invalidate the liability of the Reinsurer; but the reporting of reinsurance not authorized by this Agreement or by special acceptance hereunder shall not bind the Reinsurer except for the return of premiums paid therefor."

#### "Article IV
#### "Claims:

"The Company will advise the Reinsurer promptly of all claims and any subsequent developments pertaining thereto, which may in the Company's opinion develop into losses involving reinsurance hereunder. Inadvertent omission in dispatching such advices shall in no way affect the liability of the Reinsurer under this Agreement, provided the Company informs the Reinsurer of such omission or oversight promptly upon its discovery.

"When so requested, the Company will afford the Reinsurer an opportunity to be associated with the Company, at the expense of the Reinsurer, in the defense or control of any claim or suit or proceeding involving this reinsurance, and the Company and the Reinsurer shall cooperate in every respect in the defense of such suit or claim or proceeding.

"All court costs and expenses, including interest on judgments, paid by the Company, (excluding salaries of permanent officials and employees of the Company) connected with any resistance to, investigations of, or negotiations concerning settlement of such claims, shall be apportioned in proportion to the respective interests as finally determined. * * * *"

Under the policy issued by Inland to Yeatts on February 23, 1951, Inland agreed:

#### "I  Coverage A—Bodily Injury Liability

"To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person, caused by accident and arising out of the

ownership, maintenance or use of the automobile."

The policy further states:

"As respects the insurance afforded by the other terms of this policy under coverages A and B the company [Inland] shall:

"(a) defend any suit against the insured alleging such injury, sickness, disease or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; but the company may make such investigation, negotiations and settlement of any claim or suit as it deems expedient;

\* \* \*

"The amounts incurred under this insuring agreement, except settlements of claims and suits, are payable by the company in addition to the applicable limit of liability of this policy."

Peerless takes the position that its liability under the reinsurance agreement was limited to the dollar coverage of the policy issued the insured. In the Yeatts policy, the limit of liability for personal injury was $15,000, of which Inland retained $5,000; Peerless claims that when it paid $10,000 on the Yeatts policy, it completed all its obligations under the reinsurance agreement (except paying two-thirds of the expenses of the Arms suit, which Peerless admits it owes). Inland, however, points to Article III of the reinsurance contract quoted above, where it states that the liability of Peerless follows that of Inland in every case and shall include all undertakings of Inland with respect to every policy issued and covered by the reinsurance agreement. Under the policy issued to Yeatts, Inland incurred obligations—

(a) To indemnify Yeatts for personal liability loss up to $15,000,

(b) To defend any suit against the insured, and reserved the right to make investigations, and to negotiate and make settlement of all claims.

Both Inland and Peerless did undertake to defend and investigate, and to negotiate and control the settlement of the Arms claim. The courts in many jurisdictions have construed the right to negotiate and settle claims, coupled with the right reserved in the policy to control the case, as imposing an obligation on the insurer to use reasonable diligence and good faith in its settlement negotiations. Inland says that its expenditure of $27,500 in settlement of the Yeatts-Inland case, plus $9,915.62 expenses connected with the suit, was an expense under undertaking (b) above, and according to the express terms of the Yeatts policy, as quoted above, not subject to the $15,000 limit of the policy. Inland says that the liability arising out of the obligation of the insurer to use due diligence and good faith in its settlement negotiations becomes the liability of the reinsurer, Peerless, and once payment has been made by Inland in settlement of that liability, the obligation of the reinsurer, Peerless, becomes fixed. To support this position, Inland cites American Casualty Co. of Reading, Pa. v. Howard, 4 Cir., 1951, 187 F.2d 322. In that case the insurer took the position that once it had paid its maximum coverage of $5,000 on a liability policy, it had no further obligation to defend further litigation. The court held in an opinion written by Judge Dobie that there was no merit in the insurer's contention, that even though the insurer had paid the full coverage of $5,000, there remained an obligation by insurer to defend subsequent litigation, and pay the costs and expenses arising out of that litgation. It is said that this case clearly holds that the obligation of the insurer is not limited to the payment of the maximum coverage of a policy, and that such insurer has other obligations under the policy which can be quite expensive. It is urged that if there had been a reinsurance agreement in the case just cited, the reinsurer would have been required to pay its proportionate part of the additional expense involved.

No cases have been cited by counsel, nor has the Court found any, relating to the question of whether payment by a reinsured for negligence and bad faith in settling a claim falls within the coverage of a reinsurance contract. The courts have consistently held that a liability insurer which undertakes to defend, investigate, negotiate and settle any claim or suit against an insured, and assumes control of the right of settlement of claims against the insured, may become liable in excess of its undertaking under the policy provisions if it fails to exercise "good faith" in considering offers to compromise the claim for an amount within the policy limits. 40 A.L.R.2d 168, 178.

Applying the unambiguous language of Article III, above, to Inland's undertakings under the Yeatts policy, the conclusion is inescapable that Peerless's liability followed Inland's, including liability to defend, investigate, negotiate and settle any claim or suit against the insured. Defendant's contention that all it was required to do was pay $10,000 on the Yeatts loss is untenable. Contrary to the contentions of Peerless, there is nothing in the reinsurance agreement which limits Peerless's liability to $15,000 on the Yeatts policy. Combining the duties of the two insurance companies under the reinsurance treaty and the reinsured Yeatts policy, I conclude that in consideration for the premiums paid by Yeatts (65% of which went to Peerless and 35% to Inland), the two companies undertook the following obligations: Inland was required to stand ready to pay up to $5,000 to Yeatts for personal injury liability; Peerless was required to stand ready to pay an additional sum, up to $10,000; the two companies were required to defend, and allowed to investigate, negotiate and settle any claim or suit against Yeatts, and share the costs of such action (except for salaries of their own officials and employees) according to the interests of the two companies as finally determined when a claim was paid.

Article III of the reinsurance contract further provides that actual payment by Inland is a condition precedent to reimbursement from Peerless. Inland has shown a payment of $27,500 to Yeatts, which Peerless concedes was paid in good faith settlement of the case of Yeatts v. Inland, and has shown payment of $9,915.62 in counsel fees and other expenses relating to that case. Inland's liability to Yeatts arose out of the negligence and bad faith of attorney Pickett, of Talbott and his superiors at Inland, and of Sherwood representing Peerless, in failing to settle a claim against an insured. Under the language of the reinsurance treaty, the payment of $37,415.62 by Inland is an expense arising out of the case of Arms v. Yeatts and must be shared by the parties according to their interests in that case, just as the $1,645.37 expenses for which Peerless admits liability. Peerless having paid $10,000 in the Arms case, while Inland's share was $5,000, Peerless must reimburse Inland for two-thirds of $37,415.62, as well as two-thirds of $1,645.37, or a total of $26,040.66.

Peerless takes the further position that attorney Charles Pickett was solely the agent of Inland, and any negligence or bad faith on his part could not bind Peerless in any way, but there is no merit in this contention. While Peerless had no part in the employment of Pickett, under the second paragraph of Article IV of the reinsurance treaty, as quoted above, Peerless could have employed independent counsel if it wished and joined in the defense of the Arms v. Yeatts action. Its failure to employ other counsel ratified Inland's employment of Pickett, and Pickett acted for the mutual benefit of Inland and Peerless, so that any negligence or bad faith on his part was the negligence and bad faith of both of his principals, Inland and Peerless. Pickett's fee is included in the $1,645.37 expenses for which Peerless admits two-thirds liability, which is an indirect admission by Peerless that Pickett's services were render-

ed in Peerless's behalf. As stated in the leading treatise on insurance law, 13 Appleman's Insurance Law & Practice, § 7698, p. 480:

"An agreement by the reinsured to employ counsel and defend the claim creates merely an agency, and not a trust in equity; and the reinsuring companies, by allowing the defense to proceed, make the attorneys so employed their own."

A similar statement of the law is found in 46 C.J.S. Insurance § 1231(b), pp. 214–215:

"* * * if reinsurer fails, after notice, to participate in the defense of the action, reinsured, by operation of law, becomes reinsurer's agent sub modo for the management of the defense, and in the conduct thereof it is bound to exercise the utmost good faith. Reinsured does not, however, became a trustee for reinsurer or incur a trustee's liability. Since reinsurer may become bound by the judgment rendered against reinsured in an action on the original insurance policy, * * * it necessarily follows that reinsurer is at liberty to become a party to that action, and to make any defense thereto which is necessary and proper for the protection of its rights and the failure of reinsurer, after notice, to take part in the defense of the action by the original insured does not irrevocably commit the defense to reinsured alone, but at any time during the progress of the cause reinsurer is entitled to interfere and interpose its defense to protect its own interests, as a party who may be bound by the judgment to be rendered. Under an agreement by reinsured to employ counsel and defend the action, reinsurer, by allowing the defense to proceed, makes the attorney so employed its own, so as to be bound by the result."

As discussed earlier in my Findings of Fact, Peerless interposes the defense that it was not promptly and fully informed of the proceedings in the Arms case. The terms of the reinsurance treaty, Article IV, quoted above, provide that Inland was to advise Peerless of all claims and developments therein which in Inland's opinion might develop into losses involving reinsurance, leaving the matter to Inland's judgment, and further provide that inadvertent omission should in no way affect the liability of Peerless if Inland corrected the oversight promptly upon discovery—which the facts show was done here. Thus not only do the facts of this case refute Peerless's argument, but the reinsurance agreement itself provides that if Peerless had not been promptly and fully informed it would not affect Peerless's liability. It is also significant to note that Peerless unhesitatingly paid $10,000 on the Arms claim, and admits liability for its proportionate share of some of the expenses in that case, yet takes an inconsistent position with respect to the additional expenses of the case and alleges that Inland failed to keep Peerless promptly and fully advised. Under the facts of the case, and the provisions of the reinsurance agreement, Peerless cannot avoid liability on the ground that it was not kept informed.

In this case, the two insurance companies which are parties here cooperated in the handling of a claim in which both were interested. If their agent, Pickett, negligently and in bad faith rejected an offer to settle a case against the insured, Inland's officers and Peerless's man, Sherwood, ratified Pickett's acts. Under the clear terms of the reinsurance treaty, Peerless must pay its share of the loss occasioned by that alleged negligence and bad faith.

Counsel may prepare an order in accordance with the views expressed in this opinion.