**TURNER AND BOISSEAU, CHTD., Plaintiff,**

v.

**MARSHALL ADJUSTING CORPORATION and the Law Firm of Wilson, Elser, Moskowitz, Edelman and Dicker, Defendants.**

No. 86–6000–C.

United States District Court, D. Kansas.

Sept. 13, 1991.

Turner & Boisseau, Wichita, Kan., Dan E. Turner, Phillip L. Turner, Topeka, Kan., for plaintiff.

Richard C. Hite, Dennis V. Lacey, Kahrs, Nelson, Fanning, Hite & Kellogg, Wichita, Kan., for defendants.

## MEMORANDUM AND ORDER

CROW, District Judge.

This action is brought by Turner and Boisseau, Chtd., to recover legal fees which Turner & Boisseau claims are owed by the defendants. The central issues of this case concern contract and agency law. It is undisputed that Turner & Boisseau represented certain insureds of Transit Casualty Company (Transit), including two cases known as *Morales v. City of Garden City* ("*Morales*") and *Savard v. City of Hutchinson* ("*Savard*"). In 1985 Transit was placed in receivership. Turner & Boisseau brings this action to collect the fees it claims to have earned in defense of the *Morales* and *Savard* cases and for which it has not been paid. The only issue is whether these defendants, as agents of a partially disclosed principal, are contractually obligated to pay Turner & Boisseau for the fees it claims to have earned in defending the *Morales* and *Savard* cases. Turner & Boisseau claims damages in the amount of $68,894.42 plus interest.

This matter comes before the court upon Turner & Boisseau's motion for summary judgment and upon the defendants' cross-motion for summary judgment. Each party has filed a response.

### Standards for Summary Judgment

Summary judgment is appropriate when the movant can demonstrate that there is no genuine issue of material fact and is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Fed.R.Civ.P. 56(c). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. at 2511–12.

An issue of fact is "genuine" if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. at 2510. An issue of fact is "material" if proof thereof might affect the outcome of the lawsuit as assessed from the controlling substantive law. *Id.* at 249, 106 S.Ct. at 2510–11. Factual inferences are drawn to favor the existence of triable issues, and where reasonable minds could ultimately reach different conclusions, summary judgment is appropriate. *See Riley v. Brown & Root, Inc.*, 896 F.2d 474, 476–77 (10th Cir.1990).

### Facts

The majority of facts are undisputed; the material facts are uncontroverted. The parties stipulate that the law of the State of Kansas governs the issues of this case.

Transit was an insurance company. Transit offered insurance policies to cities and other entities to insure against various types of losses, including police professional liability insurance. On August 31, 1981, Transit entered a reinsurance agreement[1] with undisclosed underwriters who are members of Lloyd's of London (London reinsurer's).[2] Pursuant to that agreement, the London reinsurer's agreed to accept 95% of certain losses (and defense costs) insured by Transit; Transit retained the other 5% risk and thus spread 95% of the risk of loss to the London reinsurer's. In return for acceptance of 95% of the risk, the London reinsurer's received a portion of the premiums Transit received.

Under Article XI of the reinsurance agreement, the London reinsurers "had an opportunity to be associated with [Transit], at the [London reinsurer's] expense, in the defense of any claim or suit or proceeding involving this reinsurance. [Transit] will cooperate in every respect in the defense or control of such claim, suit or proceeding."[3]

An addendum to the reinsurance agreement provided in part:

### ARTICLE VI

CLAIMS

. . . . .

So far as claims or circumstances likely to give rise to a claim greater than $10,000 are concerned all papers and files in connection therewith shall be forwarded to [the London reinsurers] and [Transit] and the Agent shall cooperate with and assist [the London reinsurers] in the defence or control of any claim or suit.

. . . . .

In respect to all claims arising under this Agreement—

The [London reinsurers] shall pay their proportion of all losses and all loss adjustment expenses incurred in connection with the investigation, adjustment, appraisal, or defence (including Extra Contractual Liability) of all claims under policies reinsured hereunder (other than office expenses of the salaried employees of [Transit] and/or Agent); and further, the [London reinsurers] shall receive their proportion of all recoveries of such losses and/or loss adjustment expenses.

At some point thereafter, Transit hired Marinco, Inc. ("Marinco") as its agent. Marinco was given authority to rate and issue policies. Marinco also handled claims for Transit. Transit insured Garden City, Kansas.

In early 1983, Vickie Morales filed suit against Garden City. Prior to being retained, in a letter dated May 5, 1983, Turner & Boisseau was informed that Marinco "is not an insurer but is the issuer of certain insurance policies and the authorized representative of the companies pro-

1. "Reinsurance is essentially a form of insurance for insurance companies; insurance business is transferred from one insurer to another." R. Jerry II, *Understanding Insurance Law* § 140[a] at 683 (1987). *See* 19 *Couch on Insurance* 2d § 80:2 at 624–25 (Rev. ed. 1983).

2. The precise identity of the reinsurance underwriters remains undisclosed. For simplicity, the court will refer to the undisclosed underwriters/reinsurers as the "London reinsurers."

3. Turner & Boisseau contends that the reinsurance agreement substantiates its claim that the London reinsurers are the "true principals."

viding the insurance." In a letter dated May 13, 1983, Turner & Boisseau was retained by Marinco to defend Garden City in the *Morales* case. That letter also informed Turner & Boisseau that Marinco was not the insurer and that the insurance policy was issued through Transit. On May 4, 1984, on behalf of Garden City, Turner & Boisseau filed answers to interrogatories in the *Morales* case, which included a copy of the Transit insurance policy itself.

Prior to December 28, 1983, Turner & Boisseau was retained to defend the City of Hutchinson in the *Savard* case. On December 28, 1983, this retention was confirmed by a letter from Marinco. This letter once again informed Turner & Boisseau that Marinco "is not an insurer, but is the issuer of certain insurance policies and the authorized representative of the companies providing that insurance." The letter also states that "Hutchinson, Kansas is insured through Transit."

On April 25, 1984, Turner & Boisseau was notified that supervision of the *Morales* case was ·being transferred from Marinco to Caronia Corporation in Houston, Texas. On May 14, 1984, Joseph R. Ebbert, an attorney with Turner & Boisseau, wrote to Randall Brent of Caronia Corporation recognizing Caronia was "presently monitoring the above captioned file ..."

In May 1984, representatives of London reinsurer's contacted Thomas Wilson of the law firm Wilson, Elser, Moskowitz, Edelman and Dicker (Wilson). London reinsurer's expressed concern about the way claims on reinsured policies were being handled by Marinco. Specifically, London reinsurer's was concerned about the underwriting capabilities of Marinco. The reinsurers did not think that Marinco was doing a good job of underwriting and suspected that the claims and reserves were not being handled in a satisfactory manner.

By May 29, 1984, Wilson had been hired by London reinsurers to generally investigate Marinco's management of the insurance. This included travelling to Marinco's offices in San Antonio, Texas to review claim files. In July, 1984, Richard Klein of the Wilson law firm, headed a team which conducted the audit of claim files at Marinco. At approximately the same time, Transit Casualty was conducting its own audit of the files at both Marinco and Caronia. The audit consisted of reviewing a random sample of claim files.

Thomas Wilson of Wilson, along with Marshall Rattner, owner of Marshall Adjusting Corporation, also conducted an examination of Transit policy files located at Marinco in San Antonio, Texas.

As a result of the audits conducted by Transit and defendants, both the London reinsurers and Transit concluded that they no longer had confidence in Marinco's ability. Faced with this situation, London reinsurers desired to make certain that claim files and policy files were preserved and that Marinco was removed from involvement. The defendants were assigned the task of negotiating the transfer of claims files and policy files from Marinco.

Transit authorized the defendants to assume custody and control of the files from both Marinco and Caronia. The defendants received both oral and written authority to assume custody of the files.

In November 1984, the defendants began receiving files from Marinco and Caronia. Turner & Boisseau was notified by a letter dated November 27, 1984, that Marshall Adjusting Corporation was assuming supervision of the *Savard* file "at the instruction of the insurer." Turner & Boisseau was notified by a letter dated March 12, 1985, that "at the instruction of the insurer, [Wilson] has now assumed all further responsibility for the supervision of [the *Morales* case] to its conclusion." Turner & Boisseau was apparently aware that the defendants made reports to "London" and sought authority for settlement of cases from "London."

Prior to Wilson assuming supervision of *Morales*, Turner & Boisseau submitted interim billings and received payments for fees and expenses through Marinco, Inc. in the amount of $43,037.02. Turner & Boisseau submitted interim billings and was paid $23,061.92 for fees and expenses in

the *Morales* case after Wilson assumed supervision. Turner & Boisseau also submitted interim billings and was paid for $2,616.93 for fees and expenses in the *Savard* case after Marshall assumed supervision. These fees paid to Turner & Boisseau were paid 95% by drawing down a letter of credit (apparently established by the London reinsurers) and 5% from an escrow account established by Transit. The defendants' fees were not paid by Transit; 100% of their fees were paid by the London reinsurers.[4]

The defendants did not report to Transit concerning their handling of Transit's cases. The defendants apparently only reported to the London reinsurers, although the defendants prepared statistical reports which were sent to Transit. The defendants did not seek authority from Transit to enter into settlements with plaintiffs making claims under the policies issued by Transit. Transit had no right to accept or reject any settlement offer; the defendants looked solely to the London reinsurers for authority to settle claims. The defendants had the authority to recommend the retention or termination of counsel to the London reinsurers. The defendants did not seek any direction or authority of any kind from Transit, but at all times looked to the London reinsurers for authority and direction.[5]

On December 3, 1985, an order by the Circuit Court of Cole County, Missouri, placed Transit in liquidation. The defendants contend that order prevented them from making payments on behalf of Tran-

sit or its insureds thereafter. As the common thread running throughout this case, Turner & Boisseau contends that the Cole County order did not bar the "true principals" in London from making payments to them or other attorneys similarly situated.

By a letter dated January 14, 1986, Wilson informed Turner & Boisseau that Transit had been ordered into liquidation by the Circuit Court of Cole County, Missouri, and provided Turner & Boisseau with a copy of the court's Amended Order of Liquidation. Turner & Boisseau was also informed that "[a]ll inquiries for further information, including status of fees, on this matter should be addressed to the Receiver...." By a letter dated January 30, 1986, Marshall advised Turner & Boisseau of Transit's liquidation, attached a copy of the Amended Order of Liquidation and referred Turner & Boisseau to the receiver for all further information, including the status of fees.

Notwithstanding these instructions, Turner & Boisseau submitted statements to the defendants for *Morales* in the amount of $62,138.08 and for *Savard* in the amount of $6,757.34. Apparently, Turner & Boisseau's statement for the *Morales* case was submitted to and received by Wilson *after* Turner & Boisseau had been notified of the liquidation of Transit.[6] Turner & Boisseau's statement in the *Savard* case was forwarded to Marshall by a letter from Turner & Boisseau dated February 27, 1986.

Turner & Boisseau submitted a Proof of Claim for fees to the receiver regarding the

---

**4.** In Richard Klein's (partner in Wilson) deposition, he indicated that he never told Turner & Boisseau the identity of the reinsurers because Turner & Boisseau was not being retained by the reinsurers. Later in his deposition, Klein stated: "We were representing the reinsurers." ... "We were being paid by the reinsurers. We were authorized to act on behalf of Transit and the reinsurers."

**5.** The defendants controvert the facts contained in this paragraph. The defendants contend that this arrangement whereby the defendants only responded to the direction of the London reinsurers was the result of an agreement between Transit and the London reinsurers. The court has reviewed the deposition testimony cited by

the defendants in support of that proposition. The testimony of Richard Klein is apparently not based upon his personal knowledge and was only his personal speculation.

**6.** The cover letter to the statement in the *Morales* case is dated November 18, 1985. However, Wilson's records indicate that the letter it received bore a postmark of January 30, 1986 and was received in its office on February 4, 1986. Turner & Boisseau does not controvert that an exhibit to Eldon Boisseau's deposition indicates that the November 18, 1985 bill was "not sent." Turner & Boisseau's assertion that the statement was submitted before it had notice of Transit's liquidation is unsupported by any evidence in the record.

*Savard* case. No Proof of Claim was made regarding the *Morales* case.

Turner & Boisseau claims that it has not been paid $68,894.92 in attorneys fees. Turner & Boisseau claims to have been paid all of the fees incurred while Marinco or Caronia managed the *Morales* and *Savard* cases. Turner & Boisseau contends that these fees were incurred after these defendants began managing those cases.

The defendants' defense in this case is being paid by the London reinsurers.

### Arguments of the Parties

For purposes of these motions, only one issue remains: Are the defendants contractually bound to pay Turner & Boisseau's attorney fees for the *Morales* and *Savard* cases? In order to answer that question, the court must determine whether the defendants' assumption of supervision of the *Morales* and *Savard* cases created a new contract or a new relationship binding the defendants as agents of a partially disclosed principal (the London reinsurers).[7]

The defendants concede that a contract existed between Turner & Boisseau and Transit to provide legal services in *Morales* and *Savard*. The defendants, however, deny the existence of a contract to which they are a party. The defendants contend that the contract Turner & Boisseau entered to provide legal services in the two cases was created approximately one year before the defendants played any role in these matters. The defendants contend that the only parties to those agreements were Turner & Boisseau and Transit and that Turner & Boisseau was never in direct privity with the London reinsurers. In both cases, when Turner & Boisseau was originally hired, it knew that Marinco was not an insurer but was instead Transit's agent. The defendants contend that their entry into this case was merely a substitution of agents.

Turner & Boisseau contends that a contract exists between it and the defendants who are agents of the "true principals." Turner & Boisseau contends that an implied contract was formed, obligating the defendants to pay the fees of an undisclosed principal. Turner & Boisseau contends that its contract with Transit and its agents Marinco and Caronia has been fully performed. Turner & Boisseau contends that from the facts and circumstances it is clear that the defendants, on behalf of their "true principals," entered a new, binding contract. In this same vein, Turner & Boisseau argues that when the London reinsurers exercised their rights under the reinsurance agreement, a new contract was formed between it and the London reinsurers. Turner & Boisseau contends that at the point the London reinsurers stepped-in and took control, Transit no longer had any say in the management of the cases. At that point, Turner & Boisseau argues that the defendants had the authority to retain, hire, or fire any local counsel they chose without input from Transit. Turner & Boisseau also contends that it was advised that the defendants "were assuming 'all further responsibility' for the litigation and requested that [Turner & Boisseau] furnish reports to defendants and cease sending reports to Transit Casualty Co. and its agents, Marinco and Caronia." [8]

In short, Turner & Boisseau contends that the defendants were acting solely as the agents of undisclosed principals, namely the London reinsurers. Turner & Boisseau argues that the London reinsurers were the "true principals" and because the defendants have not specifically identified who they are, the defendants are personally liable.

### Agency Law

■ Kansas has defined "agency" as a contract by which one of the parties confides to the other the management of some business to be transacted in his name, or on

---

**7.** Under the *Restatement (Second) of Agency* § 4(2) (1958), the London reinsurers would be more appropriately termed "partially disclosed principals," rather than "undisclosed principals."

**8.** This statement is at least partially incorrect as Turner & Boisseau was informed that the defendants were assuming supervision of the case files on behalf of "the insurer." This fact does not, however, preclude summary judgment.

his account, and by which that other assumes to do the business and to render an account of it. *Professional Lens Plan, Inc. v. Polaris Leasing Corp.*, 238 Kan. 384, 390, 710 P.2d 1297 (1985). An agency relationship may be either express or implied. *Id.; Highland Lumber Co., Inc. v. Knudson*, 219 Kan. 366, 370, 548 P.2d 719 (1976). An express agency exists if the principal has delegated authority to the agent by words which expressly authorize the agent to do a delegable act. *Professional Lens Plan*, 238 Kan. at 390, 710 P.2d 1297. "An implied agency may exist if it appears from the statements and conduct of the parties and other relevant circumstances that the intention was to clothe the agent with such an appearance of authority that when the agency was exercised it would normally and naturally lead others to rely on the person's acts as being authorized by the principal." 238 Kan. 384, Syl. ¶ 7, 710 P.2d 1297.

■■ "Where the relationship of principal and agent is in issue, the party relying thereon to establish his claim or demand has the burden of establishing its existence by clear and satisfactory evidence." *Highland*, 219 Kan. 366, Syl. ¶ 1, 548 P.2d 719. An agency relationship may exist notwithstanding either a denial by the alleged principal or whether the parties understood it to be an agency. *Moore v. Adkins*, 2 Kan. App.2d 139, Syl. ¶ 7, 576 P.2d 245 (1978). The determination of what constitutes agency and whether there is any competent evidence reasonably tending to prove the relationship is a question of law. *Professional Lens Plan*, 238 Kan. 384, Syl. ¶ 5, 710 P.2d 1297; *Highland*, 219 Kan. at 370, 548 P.2d 719.

■■ Generally, "[a] person cannot be the agent of both parties to a transaction, whether the agency relates to insurance or other contracts, it being well settled that no agent can take upon himself incompatible duties or characters without the consent of both parties." 4 *Couch on Insurance* 2d § 26A:177. In certain circumstances, however, an agent may act as the agent for two parties in the same transaction. *Schick v. Warren*, 86 Kan. 812, 815,

122 P. 872 (1912). The rule preventing an agent from representing two parties to a transaction is inapplicable when both parties assent to dual representation, or have knowledge of the dual representation and do not object. 3 *Couch on Insurance* 2d § 25:40.

In *Lentz Plumbing Co. v. Fee*, 235 Kan. 266, 679 P.2d 736 (1984), the Supreme Court of Kansas discussed other relevant principles of agency:

If his agency and the identity of his principal are unknown, an agent, to avoid personal liability on a contract to be entered into on behalf of his principal, has a duty to disclose both the fact that he is acting in a representative capacity and the identity of his principal, for the party dealt with is not required to discover or make inquiries to discover such facts. Where the other party has actual knowledge of the agency and the identity of the principal, the agent will be relieved from liability, whether he himself makes the disclosure or the other party acquires the knowledge from some other source.

*Id.* Syl. ¶ 2, Syl. ¶ 3. *See Bruce v. Smith*, 204 Kan. 473, Syl. ¶ 3, 464 P.2d 224 (1970).

### Implied Contracts

■■ This court recently summarized the law of Kansas regarding implied contracts:

The existence or not of a contract is generally a question of fact. *Steele v. Harrison*, 220 Kan. 422, 429, 552 P.2d 957 (1976). "Contracts implied in fact are inferred from the facts and circumstances of the case and are not formally or explicitly stated in words." *Atchison County Farmers Union Co-op Ass'n v. Turnbull*, 241 Kan. 357, 363, 736 P.2d 917 (1987). A mutual intent to contract must be shown for an implied contract in fact to exist. *Id* at 364, 736 P.2d 917. The terms and conditions of such an agreement may be implied from the parties' conduct.

*Nature's Share, Inc. v. Kutter Products, Inc.*, 752 F.Supp. 371, 378 (D.Kan.1990). "A contract will not be implied from the mere fact that work is done which is bene-

ficial to the party sought to be charged." *Muscott v. Stubbs*, 24 Kan. 520, Syl. ¶ 2 (1880). "Whether a written instrument or undisputed facts establish the existence and terms of a contract are, however, questions of law for the court." *Hullman v. Bd. of Tr. of Pratt Community College*, 725 F.Supp. 1536 (D.Kan.1989) (citing *Hays v. Underwood, Administrator*, 196 Kan. 265, 267, 411 P.2d 717 (1966)).

### Discussion

This case, while seemingly simple at first glance, has presented the court with several thorny issues of contract and agency law. Turner & Boisseau has not supplied the court with any authority from any jurisdiction in direct support of its "true principal" theory of agency law, nor could the court locate any cases using the phrase "true principal" in this context. As the defendants suggest, Turner & Boisseau has coined this phrase for purposes of this motion. While Turner & Boisseau is entitled to summary judgment based upon the undisputed facts and applicable law, the court does not grant summary judgment on the basis of Turner and Boisseau's "true principal" theory of law.

Turner & Boisseau knew that it was originally hired on behalf of Transit and that Marinco and Caronia were Transit's agents. Later, Turner & Boisseau was informed that the defendants were going to assume supervision of the two cases. The court, is however, unable to agree with the defendants that they were merely substituted as agents for Transit, and that no "new" contract and relationship was formed between Turner & Boisseau and the defendants (on behalf of the London reinsurers) when the defendants began overseeing Transit's files.

Turner & Boisseau has not identified any authority to suggest that a change in agents necessarily creates a new contract. Under the facts of this case, however, it appears that a new contract, implied or otherwise, was formed. The defendants have provided no evidence of an agreement between Transit and the London reinsurers (other than the reinsurance agreement) whereby Transit agreed to allow the London reinsurers to assume control over the management of Transit's cases. The defendants' assumption of control of supervision of the *Savard* and *Morales* cases was at the direction of the London reinsurers (although Transit apparently authorized the transfer of supervision to the defendant). At that point in time, the defendants were no longer under the control of the Transit. Transit, did, however, enjoy the benefits of the defendants' services as its interests and the London reinsurers were similarly aligned. While it is true that none of documents which "retained" Turner & Boisseau expressly evidenced an intent to bind any party other than Transit, it is undisputed that Turner & Boisseau was retained with the consent and authority of the London reinsurers and that Transit did not retain authority over the defendants and that the London reinsurers benefited from Turner and Boisseau's services.

Turner & Boisseau contends that the reinsurance agreement between the London reinsurers and Transit establishes that the defendants were acting as agents of the London reinsurers. The defendants respond that Turner & Boisseau's efforts to use the reinsurance agreement to reach the London reinsurers is contrary to general principles of reinsurance law. In Turner & Boisseau's reply brief, Turner & Boisseau explains that "it is the facts established by the reinsurance agreement, rather than reinsurance law, that are relevant to this case. The plaintiff is seeking no recovery of reinsurance funds and is making no claim against reinsurers." Turner & Boisseau contends that the reinsurance agreement granted the London reinsurers the authority to personally assume control of the defense of pending claims at its own expense and, notwithstanding the defendants' denials, that this is in fact what occurred in this case. Turner & Boisseau contends that it was directly hired by the London reinsurers. Turner & Boisseau argues that "after defendants assumed control of the litigation, plaintiff was no longer in privity with Transit," but was instead acting on behalf of the London reinsurers.

■ The reinsurance agreement between Transit and the London reinsurers appears to be a contract of indemnity. *See Understanding Insurance Law* § 142 at 686; 19 *Couch on Insurance* § 80:65 at 671–72. "When the contract of reinsurance is strictly a contract of indemnity, the insolvency of the insurer which prevents it from making payment likewise precludes the rise of a duty of the reinsurer to make payment to the insurer." *Id.*

■ This reinsurance agreement, however, includes an additional clause which distinguishes this case from cases governed by the general rule. In the case at bar, the reinsurance agreement afforded the London reinsurers the option of assuming control of the defense of cases which it reinsured. As the defendants operated only at the direction of the London reinsurers and essentially ignored Transit, the defendants were acting as agents of the London reinsurers. The defendants' contention that Turner & Boisseau was hired *only* on behalf of Transit is unsupported by the uncontroverted facts.

As noted above, neither the plaintiff nor the defendants were able to locate any case directly on point. The court, in its independent research, was unable to locate any case squarely addressing the issues presented by this case. The court did, however, find some authority and one case which interpreted a reinsurance agreement containing a clause similar to the one found in the Transit/London reinsurer's agreement. That case, while factually distinguishable in several respects, is some, albeit not direct, support for the court's disposition of this case.

In 13A *Appleman,* § 7698, at 555 (1976), the treatise states:

> An agreement by the reinsured to employ counsel and defend the claim creates merely an agency, and not a trust in equity; and the reinsuring companies, by allowing the defense to proceed, make the attorneys so employed their own.

The only citation indicated in the treatise in support of that proposition is *Inland Mutual Ins. Co. v. Peerless Ins. Co.,* 152 F.Supp. 506 (S.D.W.Va.1957), *aff'd* 251 F.2d 696 (4th Cir.1958).

Greatly simplified, in *Inland,* Inland (the reinsured) entered a reinsurance agreement with Peerless (the reinsurer). Under the reinsurance agreement, Peerless agreed that its liability "shall follow that of [Inland's] in every case ..." Under Article IV of the reinsurance agreement the reinsurer was afforded an opportunity to be associated with the Inland, at the reinsurers' expense, in the defense and control of any claim or suit or proceeding involving this reinsurance.[9]

Inland's insured was involved in an automobile accident, resulting in injuries to the driver of the other auto. Inland hired an attorney named Pickett to handle the case; Peerless did not disapprove of this decision, nor did it choose to hire, at its own expense another attorney.

The injured driver initially claimed damages in the amount of $125,000. Attempts to settle the case prior to trial were unavailing. Following the presentation of all the evidence, the plaintiff offered to settle the case. The insured desired to accept the offer of settlement, and informed Pickett that he would look to Inland in the event the jury returned a verdict in excess of the policy limits. Pickett recommended to Inland that it reject the plaintiff's settlement offer, concluding that the insured would win or that the verdict would be a low amount. Inland rejected the plaintiff's settlement offer and a verdict was returned.

Pickett's prediction of a favorable verdict was in error. The jury returned a verdict in favor of the plaintiff in the amount of $75,000. Inland paid the insured the policy limits of $15,000, leaving a balance of $60,000 to which the insured was liable.

The insured sued Inland for negligence and bad faith in failing to settle the claim. Inland informed Peerless of the insured's suit, but Peerless refused to participate in

---

**9.** This clause is virtually identical to the clause found in the reinsurance agreement between Transit and the London reinsurers.

the defense. Inland eventually settled with the insured.

Inland brought suit against Peerless seeking reimbursement for the amounts settled and associated expenses. In arguing that it was not responsible for any amounts beyond the policy limits, Peerless argued that Pickett was the sole agent of Inland and that any negligence or bad faith by Pickett was Inland's sole responsibility. The court rejected that contention. The court, looking to Article IV of the reinsurance agreement, concluded that Peerless could have but chose not to employ independent counsel. Peerless' failure to employ other counsel ratified Inland's employment of Pickett, so that any negligence or bad faith by Pickett was the negligence and bad faith of *both principals.* 152 F.Supp. at 513.

While there are several factual differences between *Inland* and the case at bar,[10] the court in *Inland* recognized that under the reinsurance agreement, the attorney hired by the reinsured to handle the claim against its insured was the agent of both the reinsured and the reinsurer. In *Inland* the reinsurer's acquiescence in hiring Pickett was sufficient to make Pickett the agent of both principals.

■■■ In the case at bar, there is much stronger evidence that the defendants were the agents of the London reinsurers. The London reinsurers exercised their contractual rights under the reinsurance agreement and actively managed and controlled the defendants. The defendants understood that they were acting on behalf of the London reinsurers. To say that the defendants were only Transit's agents elevates form over substance. The defendants were paid and controlled by the London reinsurers. Obviously, the defendants and the London reinsurers understood that Turner & Boisseau expected to be compensated for the services it provided.

The London reinsurers' interests were similarly aligned to those of Transit: effective and efficient management and defense of claims against insureds. In fact, the

London reinsurers' had a much larger interest in effective management of the defense of claims as they were ultimately responsible for 95% of the claims under the terms of the reinsurance agreement. The mere fact that the defendants chose to continue to retain Turner & Boisseau after their assumption of the control of the *Savard* and *Morales* cases does not vitiate the fact that at that point in time a new relationship was formed.

Turner & Boisseau incurred expenses and performed services at the request of the defendants. The London reinsurers directed the defendants to request the performance of those services and accepted the benefits of those services. Until Transit entered receivership, the defendants requested that Turner & Boisseau send all bills from the two cases to them. The defendants paid Turner & Boisseau for services which Turner & Boisseau rendered after the defendants assumed supervision of the two cases.

■■■ Alternatively, Turner & Boisseau argues that it should be allowed to recover from the defendants under quasi contract or other equitable doctrines. Turner & Boisseau contends that it has bestowed a benefit upon the London reinsurers and that, even if no express or implied contract existed, the London reinsurers should be compelled to pay for the reasonable value of those services. The defendants do not expressly address this argument.

In *Pioneer Operations Co. v. Brandeberry,* 14 Kan.App.2d 289, 299, 789 P.2d 1182 (1990), the Kansas Court of Appeals succinctly summarized the law of Kansas regarding quasi-contract and unjust enrichment:

"Restitution and unjust enrichment are modern designations for the older doctrine of quasi-contracts." *Peterson v. Midland Nat'l Bank,* 242 Kan. 266, 275, 747 P.2d 159 (1987). "The theory of quasi-contract is raised by the law on the basis of justice and equity regardless of the assent of the parties." *Holiday De-*

---

**10.** The court recognizes that the dispute in *Inland* was between the reinsured and the reinsur-

er and not a dispute between the reinsurer and the attorney hired by the reinsured.

382

*velopment Co. v. Tobin Construction Co.*, 219 Kan. 701, 708, 549 P.2d 1376 (1976). "The substance of an action for unjust enrichment lies in a promise implied in law that one will restore to the person entitled thereto that which in equity and good conscience belongs to him." *Peterson*, 242 Kan. at 275, 747 P.2d 159.

The court recognizes that Turner & Boisseau's current predicament is a result of the way it chose to do business with Transit and the defendants. The court, however, agrees that it would be fundamentally unfair to allow the London reinsurers to accept the benefits of Turner & Boisseau's services, services which its agents requested be performed, but escape liability. At no point do the defendants suggest that the services provided by Turner & Boisseau were not worth the amounts claimed.

The defendants contend that questions of fact remain precluding summary judgment. First, the defendants contend that a question of fact remains regarding the sufficiency of their disclosure of the identity of the London reinsurers. Second, the defendants contend that an issue of fact exists as to whether the plaintiff has taken adequate steps to mitigate its damages.

 As to the first issue, the identity of the London reinsurers is not as of today disclosed. To suggest that identifying the city of London as a sufficient disclosure of the identity of the principal is disingenuous at best. Section 321 of the Restatement (Second) of Agency states: "Unless otherwise agreed, a person purporting to make a contract with another for a partially disclosed principal is a party to a contract." Comment a states in pertinent part:

> The fact that, to the knowledge of the agent, the other party does not know the identity of the principal is of great weight in ascribing to the other party the intention to hold the agent liable either solely, or as a surety or co-promisor with the principal. The inference of an understanding that the agent is a party to the contract exists unless the agent gives such complete information concerning his principal's identity that he can be readily

distinguished. If the other party has no reasonable means of ascertaining the principal, the inference is almost irresistible and prevails in the absence of an agreement to the contrary.

*See Lentz Plumbing*, 235 Kan. at 270–71, 679 P.2d 736. The London reinsurers remain partially disclosed principals and the defendants are therefore a party to the contract.

 As to the second issue, it is accurate that Turner & Boisseau did not file a proof of claim in the *Morales* case. This is the only fact, however, offered by the defendants in support of their claim that Turner & Boisseau has failed to mitigate its damages. "A litigant who asserts mitigation of damages in defense of a lawsuit rests under the burden both of pleading and establishing the same." *Kelly v. Best Cabs, Inc.*, 206 Kan. 654, Syl. ¶ 7, 481 P.2d 980 (1971). In the case at bar, the defendants have asserted the defense but have failed to introduce any evidence evidencing the amount by which the plaintiff's damages would have been reduced. As the defendants bear the burden of proof on this issue and have failed to introduce any evidence indicating the amount by which their damages would have been reduced, Turner & Boisseau is entitled to judgment in the full amount claimed.

IT IS THEREFORE ORDERED that Turner & Boisseau's motion for summary judgment (Dk. 163) is granted.

IT IS FURTHER ORDERED that the defendants' motion for summary judgment (Dk. 175) is denied.